**EXHIBIT 2**

VOLUME I - 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-12095 RGS

. . . . . . . . . . . . . . . . . .
                                    )
DOREEN CERRA,                       )
          Plaintiff,                )
                                    )
vs.                                 )
                                    )
AMERICAN AIRLINES,                  )
          Defendant.                )
. . . . . . . . . . . . . . . . . .

DEPOSITION OF DOREEN E. CERRA, a witness

called on behalf of the Defendant pursuant to

the Federal Rules of Civil Procedure before

Jo Anne M. Shields, Professional Shorthand

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the offices

of Fitzhugh, Parker & Alvaro LLP, 155 Federal

Street, Boston, Massachusetts, on Tuesday,

July 19, 2005, commencing at 10:19 a.m.

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
One State Street
Boston, Massachusetts  02109
Telephone (617) 742-6900

---

Page 2

APPEARANCES:

JAMES R. TEWHEY, ESQUIRE
    19 North Street
    Salem, Massachusetts  01970-3970
    (978) 741-2255
    for the Plaintiff

AMY CASHORE MARIANI, ESQUIRE
    FITZHUGH, PARKER & ALVARO LLP
    155 Federal Street, Suite 1700
    Boston, Massachusetts  02110-1727
    (617) 695-2330
    for the Defendant

DAVID W. STRICKLER, ESQUIRE
    AMERICAN AIRLINES
    4333 Amon Carter Boulevard
    MD 5675
    Fort Worth, Texas  76155
    (817) 967-1116
    for the Defendant

ALSO PRESENT:

    Deborah Sabri, Assistant to Attorney Tewhey

---

Page 3

I N D E X

Deposition of:           Direct      Cross

DOREEN E. CERRA

By Ms. Mariani              4

E X H I B I T S

No.                                        Page

              None

---

Page 4

P R O C E E D I N G S
    DOREEN E. CERRA, a witness
called for examination by counsel for the
Defendant, having been satisfactorily
identified by the production of her driver's
license and duly sworn by the Notary Public,
was examined and testified as follows:
                    * * *
            DIRECT EXAMINATION
BY MS. MARIANI:
    MS. MARIANI:  And, Mr. Tewhey, before we
begin questioning the witness, the stipulations
that I usually use are reserve objections,
except as to form, until time of trial --
    MR. TEWHEY:  Uh-huh.
    MS. MARIANI:  -- reserve motions to strike.
The witness will have 30 days to read and sign,
waiving the notary requirement.
    MR. TEWHEY:  That's fine.
Q.  Okay.  Good morning.  My name is Amy Mariani,
    and I represent American Airlines in a case
    that is pending in Federal Court.  And we're
    here today for your deposition.  Could you
    please state your name for the record?

17

1  A.  Yes.
2  Q.  And what was that position?
3  A.  I became what we call a relief agent, which
4      entailed me to drive throughout cities in
5      northern California to relieve people on
6      vacation, sick, help military installations
7      over on Tre- -- Treasure Island.  And that's
8      it.
9  Q.  And when you served as a relief agent, were you
10     performing the operations agent functions or
11     the ticketing functions?
12 A.  Ticketing.
13 Q.  Okay.  How long were you at the City Ticket
14     Office before -- before moving to this relief
15     agent position?
16 A.  Probably, two years.
17 Q.  And how long did you remain in the relief agent
18     position?
19 A.  The entire time I was in San Francisco at the
20     City Ticket Office.
21 Q.  Okay.  Did you ever work directly at the
22     airport while in San Francisco other than as a
23     replacement for someone who was on vacation
24     or -- or sick?

18

1  A.  No.
2  Q.  Was the relief agent position the final
3      position you held in San Francisco?
4  A.  Yes.
5  Q.  Could you tell me where you went next with
6      American Airlines?
7  A.  Boston, Massachusetts.
8  Q.  And do you recall approximately when you moved
9      to Boston, Massachusetts?
10 A.  Let's see.  1985.
11 Q.  And what prompted your move to Boston?
12 A.  That was home.  More family.
13 Q.  What position did you take with American
14     Airlines when you came to Boston in 1985?
15 A.  Airport operations agent.
16 Q.  Could you describe for me the job functions
17     that you performed when you took that position
18     in 1985 in Boston?
19 A.  Yes.  I would just like to say, when I first
20     came to Boston, United Airlines pilots were on
21     strike.  And because I had the experience of
22     the City Ticket Office -- my expertise was
23     ticketing -- they asked if I wouldn't mind
24     coming in to the city of Boston to do relief

19

1      work there, which I did.
2      And when that was resolved, I went back to
3      the airport.  And my duties included
4      international ticke- -- tic- -- ticketing,
5      domestic ticketing, check-in, gate agent
6      functions, baggage service functions,
7      reservation functions.  I think that covers it.
8  Q.  Did those job responsibilities change over time
9      subsequent to 1985?
10 A.  No.
11 Q.  How long did you work in airport operations
12     in -- in Boston?
13 A.  Until 198- -- wait a minute.  1991, I believe.
14 Q.  Did you leave that position for another
15     position in American Airlines?
16 A.  Yes.
17 Q.  And what position was that?
18 A.  Operations agent.
19 Q.  And how did that position differ from the
20     position you had previously held in Boston?
21 A.  Well, first of all, I relocated to Raleigh.
22     And that's where that -- North Carolina.
23 Q.  Okay.  So let me just make sure, before you
24     continue on, that I have this clear.  In 1985,

20

1      you came to Boston.  In 1991, you moved to
2      Raleigh?
3  A.  Correct.
4  Q.  Okay.  What did you do in Raleigh?
5  A.  Operations, airport operations.
6  Q.  And what were your job responsibilities in
7      Raleigh at that time?
8  A.  Everything the same, except no baggage service.
9  Q.  And how long did you remain in Raleigh?
10 A.  Let's see.  Five years.
11 Q.  Did you take another position with American
12     after leaving Raleigh?
13 A.  Yes.
14 Q.  And what was that position?
15 A.  Operations agent, airport, Boston.
16 Q.  Do you remember when you took that position?
17 A.  May of 1995.
18 Q.  And how long did you remain in that position?
19 A.  Until 1996.
20 Q.  Why did you leave that position in 1996?
21 A.  I was injured in 1996.
22 Q.  And what kind of injury did you have in 1996?
23 A.  It was a back injury.
24 Q.  Were you injured on duty?

**21**

1  A. Yes.
2  Q. When you were injured, did you take a leave of
3     absence?
4  A. Yes.
5  Q. Did you, at some point, return from that leave
6     of absence?
7  A. Yes.
8  Q. Do you recall when you returned from leave of
9     absence?
10 A. The -- approximately, three weeks after the
11    injury.
12 Q. And to what position did you return?
13 A. I returned to -- well, actually, several:  a
14    clerical position, a ticketing position, a gate
15    position.
16 Q. What did your do-- -- job title become when you
17    returned from your injury in 1996?
18 A. My job title did not change.
19 Q. When you returned from your leave of absence --
20    strike that.  You testified earlier that
21    operations involved some ticketing functions
22    and some gate functions, is that correct, in
23    Boston?
24 A. Yes.  And baggage service.

**22**

1  Q. Okay.  Were there any clerical functions
2     associated with your operations position in
3     Boston prior to your leave of absence in 1996?
4  A. Could you repeat that?
5  Q. Sure.  You testified earlier, I believe -- and
6     correct me if I'm wrong -- that your functions
7     in Boston when you became an operations agent
8     were international ticketing, domestic
9     ticketing, check-in, gate agent functions,
10    baggage service functions, and reservations
11    functions; is that right?
12 A. Yes.
13 Q. Okay.  And you testified that when you returned
14    from your leave of absence, your job title of
15    operations agent didn't change; is that right?
16 A. Yes.
17 Q. Okay.  You also testified, I think, that you
18    did three things when you returned from leave
19    of absence:  clerical position, ticketing
20    *position, and gate position; is that right?*
21 A. Correct.
22 Q. Is it fair to say that, at the time you
23    returned from your injury, ticketing was a part
24    of the operations job?

**23**

1  A. Yes.
2  Q. And gate agent functions were a part of the
3     operations job?
4  A. Yes.
5  Q. Were clerical functions part of the operations
6     job?
7  A. Yes.
8  Q. Were there any duties that you did not do after
9     your return from leave of absence that you had
10    performed before your leave of absence?
11 A. No.
12 Q. How long did you continue in your position of
13    operations agent after returning from your
14    leave of absence in 1996?
15 A. Until 1997.
16 Q. Could you tell me what happened in 1997?
17 A. Yes.  When I came back from my or-- -- original
18    leave after I got injured in 1996, I could not
19    lift, you know, the -- the amount of weight on
20    a suitcase that they wanted me to, which was
21    okay; because they put me in a light-duty
22    capacity.
23 Q. And how long did you remain in light duty?
24 A. From when I originally went back, you know,

**24**

1     that three weeks, approximately, after I got
2     injured until pre-- -- until 1997.
3  Q. When you left again --
4  A. Yes.
5  Q. -- is that correct?
6  A. That's right.  That's correct.
7  Q. Now, what prompted you to leave again in 1997?
8  A. What prompted me -- well, was the fact that
9     Management told me that I couldn't work under a
10    light-duty job because it was not in the job
11    description.
12 Q. Who from management told you that?
13 A. Kip Hamilton.
14 Q. K-i-p for --
15 A. I --
16 Q. -- a first name?  You're not sure?
17 A. I'm not sure.  I . . .
18 Q. What did you do when Mr. -- is it Mr. Hamilton?
19 A. Mrs., I believe.
20 Q. Mrs.  Okay.  What did you do when Mrs. Hamilton
21    indicated that you couldn't work light duty any
22    further?
23 A. Well, I asked her if there was any other job I
24    could do that she could put me in.  And she

Volume: II
Pages: 135-262

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-12095 RGS

```
                        |
DOREEN CERRA,           |
                        |
          Plaintiff     |
                        |
vs.                     |
                        |
AMERICAN AIRLINES,      |
                        |
          Defendant     |
                        |
```

DAY 2 - VOLUME II

CONTINUED DEPOSITION OF:  DOREEN E. CERRA

FITZHUGH, PARKER & ALVARO, LLP

155 Federal Street

Suite 1700

Boston, MA 02110-1727

September 20, 2005

Virginia Dodge
Registered Professional Reporter
DUNN & GOUDREAU

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                                    September 20, 2005

---

Page 136

APPEARANCES:

Representing the Plaintiff:
LAW OFFICE OF JAMES R. TEWHEY
19 North Street
Salem, MA 01970-3970
BY:  JAMES R. TEWHEY, ESQ.
(978) 741-2255

Representing the Defendant:
FITZHUGH, PARKER & ALVARO, LLP
155 Federal Street
Suite 1700
Boston, MA 02110-1727
BY:  AMY CASHORE MARIANI, ESQ.
(617) 695-2330

and

AMERICAN AIRLINES
4333 Amon Carter Boulevard
MD 5675
Fort Worth, TX 76155
BY:  DAVID W. STRICKLER, ESQ.
(817) 967-1116

DUNN & GOUDREAU

---

Page 137

I N D E X

WITNESS:        DOREEN E. CERRA

        DIRECT  CROSS  REDIRECT  RECROSS
By Ms. Mariani    138              258
By Mr. Tewhey     254

EXHIBIT                            PAGE
Exhibit 1, Airport Agent - Part 1.....................142
Exhibit 2, Injury on Duty Leave of Absence.............157
Exhibit 3, Handwritten notes...........................165
Exhibit 4, Letter dated July 25, 2001.................180

DUNN & GOUDREAU

---

Page 138

1        (Deposition reconvened at 10:12 a.m.)

2

3        DOREEN E. CERRA, Deponent, having previously been

4    duly sworn, deposes and states as follows:

5

6        CONTINUED DIRECT EXAMINATION BY MS. MARIANI

7

8    Q.  Ms. Cerra, have you had an opportunity to review the

9    transcript of your deposition since we last met?

10   A.  Yes.

11   Q.  Okay, and have there been any changes in your

12   personal information, address, et cetera, job, since the

13   time that we last spoke?

14   A.  No.

15       MR. TEWHEY:  Can we go off the record for a

16   second?

17       MS. MARIANI:  Sure.

18

19       (Off-record discussion.)

20

21       MS. MARIANI:  Back on.

22   Q.  (By Ms. Mariani)  There were a couple of times

23   during the course of your last deposition where you

24   couldn't remember names or places with respect to some of

---

Page 139

1    my questions.  Have you remembered any of those since we

2    last spoke?

3    A.  I can't recall what we're missing.

4    Q.  Is there any information that you're aware of today

5    that's responsive to my questions from our last

6    deposition?

7    A.  I don't think so.

8    Q.  Okay.  Terrific.  I just wanted to make sure we were

9    starting with a clean slate.

10       Since we last spoke, have you remembered any

11   additional conversations that you had with Andee Vallee?

12   A.  I can't really remember any additional.  I believe I

13   said I had four or five maybe.  I just can't -- no.

14   Q.  Do you remember any additional content from those

15   conversations?

16   A.  During one of the conversations, she did mention

17   that her husband or her boyfriend was going in for heart

18   surgery.  And she was all upset with that.  I didn't put

19   that in the deposition, I don't think.

20   Q.  Anything else you remember from your conversations

21   with Ms. Vallee that we didn't talk about last time?

22   A.  No.

23   Q.  Anything that you remember about your conversations

24   with Ms. Douglas that we didn't talk about last time?

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II

September 20, 2005

## Page 140

1  A.  No.
2  Q.  Did you remember any additional conversations that
3  you had with her since last time?
4  A.  No.
5  Q.  How about any discussions with JFK Medical?  Do you
6  remember any additional conversations beyond those we
7  talked about?
8  A.  No.
9  Q.  Do you remember any additional content of
10  conversations that you had with JFK Medical?
11  A.  No.
12  Q.  Have you remembered any other conversations you had
13  with anyone at American Airlines about your leave of
14  absence?
15  A.  No.
16  Q.  Now, at the time that you left AA, what was your
17  position?
18  A.  Passenger service agent.
19  Q.  And how long had you been a passenger service agent?
20  A.  Twenty-something years.
21  Q.  Is it fair to say that that was the only position
22  you held at American Airlines?
23  A.  Yes.
24  Q.  Could you describe for me generally what your job

## Page 141

1  responsibilities were as a passenger service agent?
2      MR. TEWHEY:  Objection.  That's been asked
3    and answered, but go ahead.
4  A.  Yes, it has been asked, the last time.
5      MR. TEWHEY:  Go ahead.
6  A.  Yeah.  What was the question?
7  Q.  (By Ms. Mariani)  The question was:  Could you
8  describe for me your job responsibilities as a passenger
9  service agent?
10  A.  Let's see.  As a passenger service agent, my job
11  responsibilities were to check in customers at the ticket
12  counter, to check in their baggage, to reissue tickets, to
13  work baggage service, to work gate functions.  That's
14  about it.
15  Q.  Is it a fair statement to say that you had to be
16  able to do each of those things to serve as a passenger
17  service agent?
18  A.  Yes.
19  Q.  And I'm going to apologize in advance if I ask you
20  some questions that are a little bit repetitive from last
21  time, but sometimes it's necessary to ensure continuity
22  here today.
23      As a passenger service agent, were you at times
24  responsible for operating the jetway?

## Page 142

1  A.  Yes.
2  Q.  And were you responsible for safeguarding
3  passengers' safety?
4  A.  Could you tell me what you mean by that?
5  Q.  Sure.  Were part of your responsibilities as a
6  passenger service agent to make sure that passengers got
7  to and from their flights safely?
8  A.  Yes.
9  Q.  And on and off of those flights safely?
10  A.  Yes.
11      MS. MARIANI:  Can I have this document
12    marked as Exhibit 1, please?
13      (Exhibit 1, Airport Agent - Part 1, marked for
14      identification.)
15  Q.  (By Ms. Mariani)  Ms. Cerra, I'm showing you what
16  has been marked as Exhibit 1 to your deposition.  Have you
17  seen this document before?
18  A.  Yes.
19  Q.  And what is it?
20  A.  It's the job requirement for a customer -- passenger
21  service agent.
22  Q.  And at the top of the document on the first page, it
23  refers to "airport agent."  Is that a term that is also
24  used to describe a passenger service agent?

## Page 143

1  A.  Yes.  I would say.  That's just my opinion.
2  Q.  Can you take a few moments to look the document over
3  because I'm going to ask you some questions about it.
4  A.  Okay.
5  Q.  Please let me know when you've had an opportunity to
6  review it.
7  A.  Okay.
8      MR. TEWHEY:  Before we start, can I see my
9    client for a second?
10      MS. MARIANI:  Sure.
11
12      (A recess was taken.)
13
14      MS. MARIANI:  Back on the record.
15  Q.  (By Ms. Mariani)  Ms. Cerra, have you had an
16  opportunity to review what I marked as Exhibit 1 to your
17  deposition?
18  A.  Yes.
19  Q.  And is it fair to say that the document is broken
20  out into a couple of different parts, one of which is
21  entitled Job Description, one is entitled Job
22  Requirements, and one is entitled Essential Job Functions?
23  A.  Yes.
24  Q.  Let's take a look first at the section entitled Job

3 (Pages 140 to 143)

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                    September 20, 2005

## Page 144

1  Description. Based on your experiences as a passenger
2  service agent, is that a good description of what the job
3  is?
4  A.  I would say yes.
5  Q.  Is there anything missing from that description?
6      MR. TEWHEY: Objection.
7      If you know.
8  Q.  (By Ms. Mariani) Let me rephrase. Based on your
9  experience as a passenger service agent, are there job
10 functions that you perform that are not listed in this job
11 description?
12 A.  No. I would say that's a good description.
13 Q. * Moving on to Essential Job Functions, are there any
14 functions listed here that you did not have to perform
15 while you were a passenger service agent?
16     MR. TEWHEY: Objection.
17     You can answer.
18 A.  What was the question?
19     MS. MARIANI: Can you read back the
20     question, please?
21
22     * (Question read.)
23
24 A.  No.

## Page 145

1  Q.  (By Ms. Mariani) Are there any functions listed
2  here that you believe you would not have to do to perform
3  your job as a passenger service agent?
4      MR. TEWHEY: Objection.
5      You can answer.
6  A.  That I wouldn't have to do?
7  Q.  (By Ms. Mariani) Correct.
8  A.  Do you mean like in 23 years, have I -- is there
9  stuff in here that I never had to do? Is that what you
10 mean?
11 Q.  Let me rephrase the question.
12 A.  Yeah.
13 Q.  To be qualified as a passenger service agent, did
14 you have to know how to do all of the things listed as
15 essential job functions?
16 A.  No.
17 Q.  Why not?
18 A.  Because you were on restriction a lot of the times
19 from working different areas.
20 Q.  When you say "on restriction," what do you mean?
21 A.  When you come out of training, you have to stay at
22 one place. If you don't know the job, they wouldn't let
23 you bid the job.
24 Q.  When you have been qualified to perform the various

## Page 146

1  functions assigned to a passenger service agent after your
2  training is completed, would you need to know all of these
3  various job functions that are listed to perform your
4  duties?
5  A.  No.
6  Q.  Why not?
7  A.  Because there's so many people that are qualified to
8  work the positions better than others, that you do not
9  have to know all of this, and you are still classified as
10 an agent.
11 Q.  Is it fair to say that your -- strike that.
12     At some point in time, because of the bidding
13 process, your job might change within the airport; is that
14 correct?
15 A.  Yes.
16 Q.  And if your job is changed, you might be asked to
17 perform different functions than you usually do or usually
18 have in the past; is that right?
19 A.  Mm-hmm. Yes.
20 Q.  And to be able to perform all of the tasks that
21 passenger service agents perform, you would need to do
22 everything on this list, would you not?
23     MR. TEWHEY: Objection.
24 A.  No.

## Page 147

1  Q.  (By Ms. Mariani) What would you not have to do to
2  be able to perform the various tasks that a passenger
3  service agent performs from this list?
4  A.  Do you have a pen? There's quite a few of them that
5  I need to --
6  Q.  Why don't we walk through it one by one then? And
7  that might make it easier.
8  A.  Yeah. Because there's quite a few.
9  Q.  Sure. As a passenger service agent, did you have to
10 have the ability to handle multiple tasks simultaneously?
11 A.  Yes.
12 Q.  And did you have to have the ability to stand at a
13 ticket counter position?
14 A.  Yes.
15 Q.  Did you have to have the ability to listen,
16 comprehend, ask questions and evaluate customer needs?
17 A.  Yes.
18 Q.  Did you have to have the ability to respond verbally
19 to customers, based on your memory, source material or
20 Sabre, when they had questions?
21 A.  Yes.
22 Q.  Did you have to communicate verbally with ground
23 crew and flight crew with regard to meeting arriving
24 flights?

4 (Pages 144 to 147)

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                    September 20, 2005

| Page 156 |
|---|

1   Q.   You testified earlier that one of the things that
2   you did have to do was to operate the jetway; is that
3   right?
4   A.   Yes.
5   Q.   And do you understand that American Airlines had a
6   responsibility to its passengers to make sure that
7   passenger service agents were qualified to operate the
8   jetway?
9        MR. TEWHEY: Objection.
10       You can answer.
11  A.   What was the question?
12  Q.   (By Ms. Mariani)  Let me rephrase it.
13  A.   Yeah.
14  Q.   Do you believe that American Airlines had a
15  responsibility to its passengers to ensure that passenger
16  service agents were qualified to operate the jet bridge?
17       MR. TEWHEY: Objection.
18       You can answer.
19  A.   I don't know.
20  Q.   (By Ms. Mariani)  Do you believe that American had a
21  responsibility to make sure its passengers weren't injured
22  when they were entering or exiting the jet bridge?
23  A.   Yes.
24  Q.   And do you agree that American Airlines, as a

| Page 157 |
|---|

1   commercial carrier, owed the highest duty of care to its
2   passengers?
3        MR. TEWHEY: Objection.
4        You can answer.
5   A.   I don't know.
6        MS. MARIANI: I'm going to have this marked
7        as Exhibit 2, please.
8        (Exhibit 2, Injury on Duty Leave of Absence,
9        marked for identification.)
10  Q.   (By Ms. Mariani)  I'm showing you what's been marked
11  Exhibit 2 to your deposition.  Is this a document that you
12  recognize?
13  A.   Yes.
14  Q.   And how do you recognize it?
15  A.   Could you give me a minute to read it over?
16  Q.   Sure.
17  A.   Thank you.  The "NavigAAtor" is what I recognize.
18  It's all over the place.
19       MS. MARIANI: Off the record.
20
21       (A recess was taken.)
22
23       MS. MARIANI: Back on the record.
24  Q.   (By Ms. Mariani)  Ms. Cerra, have you had an

| Page 158 |
|---|

1   opportunity to review what's been marked as Exhibit 2?
2   A.   Yes.
3   Q.   And is the document familiar to you?
4   A.   Yes.
5   Q.   How is it familiar to you?
6   A.   I've seen it somewhere in the past few years.
7   Q.   Had you reviewed this document while you were
8   employed at AA?
9   A.   Do you mean when I was on leave of absence?
10  Q.   Correct.  While you remained employed, but on leave
11  of absence at AA.
12  A.   I can't remember.
13  Q.   Directing your attention to the second paragraph,
14  the section entitled Employee Responsibility.  Do you see
15  that section?
16  A.   Mm-hmm.
17  Q.   Were you aware, as is stated in the first paragraph
18  of that section, that injury-on-duty leaves of absence
19  could not exceed five years under company policy?
20  A.   Yes.
21  Q.   And was that your understanding at the time you went
22  out on leave of absence?
23  A.   I didn't know at that time.
24  Q.   At some point during your leave of absence, did you

| Page 159 |
|---|

1   become aware that company policy was to limit leaves of
2   absence to five years?
3   A.   Yes.
4   Q.   And do you recall how you became aware of that?
5   A.   Not really.  I talked to my friend who lived down
6   the street, was a flight attendant for American,
7   because -- yeah.  She told me.
8   Q.   Now, at some point in time, did you seek to -- we
9   talked the last day of your deposition that you did seek
10  to return to work from a leave of absence; is that
11  correct?
12  A.   Yes.
13  Q.   And what is your understanding of what you had to do
14  to get back to work?
15  A.   To contact the human resources and find out how I
16  get back to work.
17  Q.   And I believe you testified that you did in fact
18  speak with Sharon Douglas about the steps that you needed
19  to take to get back to work; is that correct?
20  A.   Correct.
21  Q.   And I believe you also testified that she advised
22  you to consult with the person who would then be your
23  supervisor, Andee Vallee; is that right?
24  A.   No.

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

Doreen Cerra vs. American Airlines, Inc.
Doreen E. Cerra - Day 2 - Volume II
September 20, 2005

Page 160

1  Q.   What is your recollection about what Ms. Douglas
2  told you?  And I apologize if we're rehashing --
3  A.   It's okay.  I know.  I'm trying to remember from all
4  those years ago, to be honest with you.
5      Let's see.  Sharon Douglas told me that I would have
6  to get cleared through the medical department.
7  Q.   And you testified at your last day of deposition
8  that you did in fact contact Medical; is that correct?
9  A.   Yes.
10 Q.   And I believe you testified also at your last day of
11 deposition that you never heard back from Medical; is that
12 right?
13 A.   Well, I heard back from them.  I don't know if it
14 was the same phone call or --
15 Q.   Could you tell me what you heard back from Medical?
16 A.   I'm sorry.  I can't remember at this time what.
17 Q.   Did Medical ever tell you that you were not cleared
18 to return to work?
19 A.   No.
20 Q.   Did anyone ever tell you you were not cleared to
21 return to work?
22 A.   Yes.
23 Q.   And was that Andee Vallee in the conversation you
24 discussed --

Page 161

1  A.   Yeah.
2  Q.   -- at our last deposition day?
3  A.   Yes.
4  Q.   Did anyone else at AA ever tell you were not
5  cleared to return back to work?
6  A.   There was a nurse by the name of Susan that told me
7  I would not be cleared for a long, long time.
8  Q.   And where was Susan's location?
9  A.   New York.
10 Q.   Do you recall when you spoke with Susan?
11 A.   No.
12 Q.   Did Susan say anything besides that you would not be
13 cleared for a long, long time?
14 A.   That she would have Betty call me.
15 Q.   And did Betty ever call you?
16 A.   Yes.
17 Q.   And do you recall when Betty called you?
18 A.   No.
19 Q.   What, if anything, did you do after hearing from
20 Susan that you would not be cleared for a long, long time?
21 A.   Continued to try to get my clearance.
22 Q.   What steps did you take to continue to try to get
23 your clearance?
24 A.   Called Medical, got my letters from my doctors that

Page 162

1  they said I needed.  Called Medical again.  Several calls
2  to the medical department.
3  Q.   Over what period of time did these calls to the
4  medical department take place?
5  A.   I don't remember.
6  Q.   Do you know whether you could have appealed
7  Medical's conclusion that you were not cleared to return
8  to work?
9  A.   Did I know if I could have appealed?
10 Q.   Yes.
11 A.   Yes.
12 Q.   And what was your understanding of the process that
13 you would use to appeal?
14 A.   That first, they would have to tell me why they
15 wouldn't reinstate me.
16 Q.   Okay.  And to the best of your knowledge, did
17 Medical tell you why they wouldn't reinstate you?
18 A.   To the best of my knowledge, no, they never told me
19 why I was not reinstated.
20 Q.   You mentioned a few minutes ago that Susan told you
21 it was because of your medicines; is that right?
22 A.   No.
23 Q.   What did Susan tell you specifically?
24 A.   Just that it would be a long, long, long time.

Page 163

1  Q.   After learning that you were not cleared to return
2  to work, what step would be next in the appeals process,
3  in your understanding?
4  A.   I don't know.
5  Q.   Other than making phone calls to Medical, what other
6  steps, if any, did you take to clarify your situation?
7  A.   Contacted my lawyer.  Had my doctors write clearance
8  letters.
9  Q.   Were your doctors provided with the document that
10 we've reviewed as Exhibit 1 to your deposition?
11 A.   Yes.
12 Q.   And at the time that you sought to return to work, I
13 believe you testified that you were on several
14 medications; is that correct?
15 A.   Mm-hmm.
16 Q.   And I believe you testified at your last deposition
17 that several of them had warning labels on them regarding
18 drowsiness; is that correct?
19 A.   Yes.
20 Q.   Did you contact Andee Vallee to see if there were
21 any steps that could be taken to return you to work with
22 some kind of accommodation?
23 A.   Yes.
24 Q.   When did you contact Ms. Vallee to make such a

8 (Pages 160 to 163)

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II         September 20, 2005

---

Page 164

1 request?
2 A. In September.
3 Q. Of what year?
4 A. '01.
5 Q. What do you recall about that conversation?
6 A. That she would call me back.
7 Q. And what do you remember requesting that she do?
8 A. She was going to find out why they would not let me
9 return to work.
10 Q. Did she in fact find out why they would not let you
11 return to work?
12 A. I don't know.
13 Q. Did you have any further conversations with
14 Ms. Vallee?
15 A. Not that I -- I don't remember.
16 Q. During your conversation with Ms. Vallee, did you
17 ask her to do anything besides to look into why you were
18 not being permitted to return to work?
19 A. No.
20 Q. Did you ask her to see if any modifications could be
21 made that would allow you to return to work?
22 A. We never got that far because she wasn't aware of
23 the reason I could not return to work herself.
24 Q. Did you make any request of Sharon Douglas for a

---

Page 165

1 modification to the position?
2 A. No.
3 Q. Did you make a request to Chris Konevich for a
4 modification in the position?
5 A. No.
6 Q. How about to Bron McKenzie?
7 A. No.
8 Q. And at the time you were speaking to Medical, I
9 believe you testified earlier that you spoke with a nurse
10 named Betty and a nurse named Susan; is that right?
11 A. I believe it's Susan. I know for sure it's Betty.
12 I gave you some notes. That will have her -- the other
13 nurse's name on there.
14 Q. Terrific. We'll take a look at those in a few
15 minutes.
16 Did you speak with anyone in Medical besides Susan
17 and Betty?
18 A. The receptionist.
19 MS. MARIANI: May I have these marked as
20 the next exhibit, please?
21 (Exhibit 3, Handwritten notes, marked for
22 identification.)
23 Q. (By Ms. Mariani) Ms. Cerra, I'm showing you what's
24 been marked as Exhibit 3 to your deposition. Do you

---

Page 166

1 recognize this group of materials?
2 A. Yes.
3 Q. And what are they?
4 A. These are some of the notes that I had taken during
5 different conversations.
6 Q. And were these conversations with regard to your
7 employment at American Airlines?
8 A. Yes.
9 Q. I want to go through these notes and ask you first
10 of all for a couple of clarifications, and second, then
11 ask you some questions about the notes themselves.
12 Now, it appears that some of these notes have dates,
13 and others do not. Is that correct?
14 A. Correct.
15 Q. And the first page does not appear to have a date on
16 it, other than what looks to be a 4/17 at the bottom; is
17 that correct?
18 A. I don't know.
19 Q. On the second page, the notes appear to be dated
20 4/17/01. Is that right?
21 A. Yes.
22 Q. So would it be fair to say that at least the second
23 page of notes details discussions that you had on April 17
24 of 2001?

---

Page 167

1 A. Yes.
2 Oh, yeah. It was Susan.
3 Q. Now, directing your attention to the bottom of the
4 first page of notes, the third line from the bottom
5 appears to read 3/12/01; is that correct?
6 A. Mm-hmm.
7 Q. Is that "yes," ma'am?
8 A. Oh, I'm sorry. Yes.
9 Q. And in connection with that date, it looks like it
10 reads, "Spoke to Betty. She was going to get meds from
11 SRS." Is that right?
12 A. Yes.
13 Q. And do you recall having a discussion with Betty on
14 or about March 12, 2001?
15 A. No.
16 Q. Do you remember having a conversation with Betty in
17 which she said she was going to get meds from SRS?
18 A. Yes.
19 Q. And what, if anything, do you remember besides
20 Betty's statement that she was going to get meds from SRS?
21 A. That conversation with her was -- oh, I believe --
22 she didn't have any of my medical records, and she wanted
23 me to send all of my medical records to her. And SRS was
24 the insurance company that had the entire lot of them, so

---

9 (Pages 164 to 167)

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II

September 20, 2005

## Page 168

1  I had told her to get them from them because they had
2  everything and I didn't.
3  Q.   Anything else you recall about the conversation in
4  which your medical records were discussed?
5  A.   Yes.  That she had hardly anything in my file, what
6  was wrong with me.  They found my file while they were
7  cleaning out the office, and they had no idea why I was
8  even out.  They had no records.  Oh, it was a mess.
9      Then they were blaming it on the management in
10 Boston because of the records not being sent to them
11 and --
12 Q.   Is this all in this same conversation?
13 A.   I don't think so.  I don't know.
14 Q.   Anything else you remember specific to that
15 conversation in March?
16 A.   No.  No.
17 Q.   Directing your attention to the second page, there's
18 a note that appears to be dated 4/17, 3:00.  Do you see
19 that note?
20 A.   Yep.
21 Q.   And the note appears to indicate, "NYC med called.
22 Betty will call back.  Betty called back, said she never
23 received SRS med.  She said the story is changing.
24 Dr. Farber.  Will contact Dr. Farber with questions."

## Page 169

1      What, if anything, do you recall about a
2  conversation with Betty in which you discussed that the
3  story is changing?
4  A.   I have no idea.
5  Q.   Does this note jog your memory at all with respect
6  to that conversation?
7  A.   No.
8  Q.   Directing your attention to the next page, it
9  appears there's a note dated 5/21/01 with payroll's
10 telephone number.  Is that right?
11 A.   Yes.
12 Q.   And the first paragraph on that page discusses an
13 issue regarding Super Saver; is that correct?
14 A.   Mm-hmm.  Yes.
15 Q.   And did the Super Saver issue have anything to do
16 with your leave of absence?
17 A.   No.
18 Q.   Directing your attention to the next note, which
19 appears to be dated 7/31/02, does that note have to do
20 with your return from leave of absence?
21 A.   No.  These -- that's not -- let me -- this 7/31/02?
22 Q.   Yes.  That's correct.
23 A.   Yes.  Actually, they still showed me on payroll in
24 July of '02.  They had already got rid of me.

## Page 170

1  Q.   So this was a payroll issue after your separation
2  from the company?
3  A.   Right.  I couldn't get my money or anything because
4  they still showed me working there.  It was just a big
5  mess.
6  Q.   Okay.  Directing your attention to the next page, do
7  the next few notes in August of '02 again deal with
8  payroll issues?
9  A.   Let's see.
10     Oh, yeah.  It was payroll and my -- it was my Super
11 Saver.  And I had no money.  They were holding up my 401
12 because they never showed me out of work yet, and several
13 months had passed.  Yeah.  Several months passed, and it
14 was a little incompetency on behalf of the payroll
15 department in Boston, I guess.  I don't know.
16 Q.   But fair to say that the -- that page of notes does
17 not deal with your return-to-work issues; is that correct?
18 A.   No.  As I said, these were after they sent me my
19 letter that I was no longer working, and I was just trying
20 to get the money that they owed me.  And they never showed
21 me off payroll.  They still in August had me on payroll.
22 Q.   Directing your attention to the next page, which
23 appears to be dated 8/22/02, there's a reference to Kip
24 Hamilton in the middle of the page.  I believe you

## Page 171

1  testified at your last day of deposition that Ms. Hamilton
2  was your supervisor at the time you first went out on
3  injury-on-duty leave; is that correct?
4  A.   No.
5  Q.   Was Ms. Hamilton your manager at some point in time?
6  A.   She was a passenger service manager.  She was a head
7  of the supervisors.  She was the supervisors' boss.
8  Q.   So at the time you went out on injury-on-duty leave,
9  she was your boss's boss?
10 A.   I can't remember if she was still there when I went
11 out on injury-on-duty.  You'd have to --
12 Q.   Directing your attention to the middle of the page,
13 the note appears to read -- and please correct me if I
14 read this wrong -- "Kip Hamilton MGR ECRO.  Not as young
15 as we used to be, exclamation point.  Threatened Konevich
16 with her job."
17     Could you tell me what that refers to?
18 A.   Yes.  She told me -- when I was doing light duty, my
19 doctor told her that the job they had put me on was not a
20 light duty job because they still -- they had me on
21 painkillers like Vicodin, and they still had me doing
22 stuff behind the ticket counter and -- I mean, running
23 around on that stuff.
24     And she -- and so I told her, I said, "Kip, I can't

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II

September 20, 2005

| Page 172 |
|---|
| 1  be doing all this stuff. My back's not getting better. |
| 2  I'm on, you know, pain pills and everything." |
| 3      And she came out, and she said, "Doreen," she said, |
| 4  "none of us" -- she goes, "We're not as young as we used |
| 5  to be." |
| 6      And I'm like, "Yeah." And I said, "Well" -- |
| 7      She intimidated me, that woman. She was -- I don't |
| 8  know. I don't know. No kidding, we're not as young as we |
| 9  used to be. |
| 10  Q.   And so that conversation was back before you went |
| 11  out on injury-on-duty leave? |
| 12  A.   Yeah. Yes. Uh-huh. |
| 13  Q.   What does the reference "threatened Konevich with |
| 14  her job" refer to? |
| 15  A.   Oh, because Chris Konevich was my supervisor at the |
| 16  time, and when they had me on the light duty in the |
| 17  accounting department -- which American says they don't |
| 18  have an accounting department, but it's where we counted |
| 19  all the money and tickets and so on, Chris Konevich came |
| 20  in and told me that -- |
| 21      She said, "Doreen, you can't work in this department |
| 22  because Kip said it's not part of an agent duty." |
| 23      And I said, "Well, you know, what -- what do you |
| 24  want me to do?" I said, "I can't, you know, go out and |

| Page 173 |
|---|
| 1  lift 100-pound bags. I mean, I'm on" -- |
| 2      So she said, "Listen." She goes, "This is just -- |
| 3  she's my boss, and if I don't tell you you can't work |
| 4  here, then she'll get rid of me." |
| 5  Q.   And is that what precipitated your going out on |
| 6  injury-on-duty leave? |
| 7  A.   No. |
| 8  Q.   What job did you assume after Ms. Konevich |
| 9  reassigned you from accounting? |
| 10  A.   They had me working behind the ticket counter, but |
| 11  Kip Hamilton said, "You don't have to pick bags up." |
| 12  Q.   Would you like to take a break for a couple of |
| 13  minutes? |
| 14  A.   They had me -- then they made a position with this |
| 15  portable ticket counter -- with this portable ticket |
| 16  counter beside the front door of the entrance coming in |
| 17  from the skycap well. And it was -- it was put there for |
| 18  me, to answer questions and reissue tickets and run people |
| 19  to security. |
| 20      And that's what they did. And I had to basically |
| 21  stand there. I forget how many hours they had me working |
| 22  And I had to stand there -- which was not a problem, but |
| 23  that's not what it entailed, what they told me. It just |
| 24  got to be like this incredible job. |

| Page 174 |
|---|
| 1      It was, like, worse than the ticket counter. I |
| 2  should have stayed behind the ticket counter. It was like |
| 3  everyone sent their problems over there. It was -- |
| 4  Q.   Did you stay in that position until you went out -- |
| 5  A.   Yes. |
| 6  Q.   -- on injury leave? |
| 7  A.   Yes. |
| 8      MR. TEWHEY: Could we take a break for a |
| 9  minute? |
| 10      MS. MARIANI: Sure. |
| 11 |
| 12      (A recess was taken.) |
| 13 |
| 14      MS. MARIANI: Back on the record. |
| 15  Q.   (By Ms. Mariani) Before we took a short break, you |
| 16  were testifying that the last position you held before |
| 17  going on injury-on-duty was working at a portable ticket |
| 18  counter; is that right? |
| 19  A.   Yes. |
| 20  Q.   And I believe you testified, and please correct me |
| 21  if I'm wrong, that you didn't have a problem with the job |
| 22  physically; is that right? |
| 23  A.   Mm-hmm. |
| 24  Q.   Is that a "yes," ma'am? |

| Page 175 |
|---|
| 1  A.   I'm trying to think. |
| 2  Q.   Sure. |
| 3  A.   Yes. That's why I left. |
| 4  Q.   You left because you were having a physical problem. |
| 5  What physical problem were you having? |
| 6  A.   The longevity of standing, and my back was just, |
| 7  like, a mess. |
| 8  Q.   How long were you in the position before you |
| 9  requested that you be taken out of it? |
| 10  A.   I don't remember. |
| 11  Q.   You mentioned that in that position, you were sent |
| 12  what sounded like the problem cases; is that right? |
| 13  A.   Well, I shouldn't -- yes. A lot of the ticket |
| 14  agents would send over their late passengers, and I would |
| 15  have to either reissue their tickets or try to run them |
| 16  down to security and -- yeah. It did become -- it |
| 17  became -- yeah. Like the problem -- plus it was freezing, |
| 18  and the door was always opening and -- |
| 19  Q.   Would you say that the job was more emotionally |
| 20  demanding than working at the ticket counter? |
| 21  A.   No. |
| 22  Q.   In what ways was it more difficult than working at |
| 23  the ticket counter? |
| 24  A.   Well, because I was in really bad pain with my back, |

11 (Pages 172 to 175)

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                    September 20, 2005

Page 176

1  and I was doing -- just standing. It just couldn't -- I
2  couldn't stand like that.
3  Q.   You would have been standing at the ticket counter,
4  though, wouldn't you?
5  A.   Yes.
6  Q.   And you'd be working with -- potentially working
7  with baggage behind the ticket counter as well, correct?
8  A.   You might have to rephrase that. I don't know what
9  you're getting at.
10 Q.   Sure. When you're behind the ticket counter, you
11 also have to deal with baggage most of the time, don't
12 you?
13 A.   Not on -- I wasn't going to deal with baggage on
14 restricted duty.
15 Q.   Okay. But you would be standing behind the counter,
16 correct?
17 A.   If they put me behind the counter instead of their
18 portable --
19 Q.   Right.
20 A.   -- ticket counter?
21 Q.   Correct.
22 A.   Yes. But I -- yes. But I could leave, like,
23 whenever I wanted.
24 Q.   So the difference between working behind the ticket

Page 177

1  counter and working behind the portable ticket counter was
2  that you could leave the main ticket counter if you had
3  to?
4  A.   If I had to, yes, because it would be at the end and
5  I could just go sit for a couple of minutes.
6  Q.   But you were not able to sit for a couple of minutes
7  at the portable ticket counter?
8  A.   No.
9  Q.   Why not?
10 A.   You just couldn't.
11     Oh, they did have a chair, I think, but that made my
12 back worse. I can't remember. I think they had a chair.
13 Q.   Did you request a different chair?
14 A.   I can't remember. You couldn't -- I don't remember.
15 Q.   You testified a little while ago that you had a
16 conversation with Susan in which Susan said that it would
17 be a long time before you'd return to work; is that right?
18 A.   Yes.
19 Q.   Did you ask Susan for an explanation as to why it
20 would be a long time before you could return to work?
21 A.   Yes.
22 Q.   And what, if anything, did Susan tell you?
23 A.   She couldn't give me any information.
24 Q.   And why couldn't she give you any information?

Page 178

1  A.   I don't know.
2      MR. TEWHEY: Objection.
3  Q.   (By Ms. Mariani) Do you know why -- strike that.
4      What did Susan tell you, if anything, about why she
5  couldn't give you further information?
6  A.   I would have to -- she said I would have to talk to
7  Betty.
8  Q.   And did you in fact call Betty?
9  A.   I'm sure I did.
10 Q.   Are all of the calls that you made to AA Medical
11 listed in the notes that have been marked as Exhibit 3?
12 A.   No.
13 Q.   Are most of the calls that you made to AA Medical
14 listed in what's marked as Exhibit 3?
15 A.   I don't know.
16 Q.   How many calls approximately do you remember making
17 to AA Medical?
18 A.   I don't know.
19 Q.   Why would you make notes of some conversations, but
20 not of other conversations with AA Medical?
21 A.   I don't know. Paper was there.
22 Q.   Did you think it was important to document the
23 conversations you had with AA Medical?
24 A.   Yes.

Page 179

1  Q.   And did you try to document as many conversations
2  with AA Medical as possible?
3  A.   Yes.
4  Q.   Do you remember any specific times that you did not
5  document conversations with AA Medical?
6  A.   No.
7  Q.   Do you remember any conversations that you had with
8  AA Medical that are not listed in the notes?
9  A.   I can't remember.
10 Q.   You can't remember any conversations, or you don't
11 know if there are any conversations?
12 A.   I can't remember if there were any conversations
13 that weren't on there.
14 Q.   You testified earlier that you had your doctors
15 write letters for you; is that right? In connection with
16 your attempt to return to work?
17 A.   Yes.
18 Q.   Do you know how many letters your doctors wrote?
19 A.   Just the one that they cleared me to go back.
20 Q.   So each of your doctors wrote one letter clearing
21 you to go back to work; is that right?
22 A.   I believe so.
23 Q.   Did you request that your doctors write any
24 additional letters beyond the letters clearing you to go

12 (Pages 176 to 179)

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                                September 20, 2005

Page 180

1   back to work?
2   A.   No.
3   Q.   When you encountered problems in returning to work,
4   did you ask them to take any further steps?
5   A.   No.
6   Q.   Did you --
7   A.   Can I strike that? I don't remember. I could have.
8   I better -- yeah. I don't remember that.
9   Q.   Did you receive copies of the letters that your
10  doctors wrote to AA Medical?
11  A.   I don't know.
12       MS. MARIANI: Let's have this marked as the
13       next exhibit, please.
14       (Exhibit 4, Letter dated July 25, 2001, marked
15       for identification.)
16  Q.   (By Ms. Mariani) Ms. Cerra, I'm showing you what's
17  been marked as Exhibit 4 to your deposition. Do you
18  recall receiving this letter at any point in time?
19  A.   I didn't know this letter -- what did you ask me?
20  Q.   Did you ever get a copy of this letter?
21  A.   Yes.
22  Q.   And how did you get a copy of this letter?
23  A.   I went to his office and got a copy of this letter.
24  Q.   Did you ever get copies of other letters that

Page 181

1   Dr. Sahadeo wrote to AA Medical, if there are such
2   letters?
3   A.   No.
4   Q.   Do you know if Dr. Sahadeo ever wrote any letter
5   beyond the one that's marked as Exhibit 4 to AA Medical?
6   A.   No.
7   Q.   And for the record, what is the date of this letter?
8   A.   July 25, 2001.
9   Q.   Do you recall asking Dr. Sahadeo on or about that
10  time to write to AA Medical?
11  A.   No. I didn't ask him to write the letter.
12  Q.   And why would Dr. Sahadeo be writing to AA unless
13  you had asked him to do so?
14  A.   Because I think the medical department asked them to
15  write the letter.
16  Q.   So is it your understanding that the medical
17  department contacted Dr. Sahadeo, requesting that he give
18  them an update on your medical condition?
19  A.   Yes.
20  Q.   Are you aware of any contacts between Dr. Sahadeo
21  and American Airlines before July of 2001?
22  A.   No. I don't remember.
23  Q.   Are you aware of whether AA Medical needed a letter
24  of clearance from Dr. Sahadeo before it could determine

Page 182

1   whether you could return to work?
2   A.   Yes. They needed a letter of clearance.
3   Q.   So is it fair to say that AA Medical couldn't have
4   considered your case until it received this letter from
5   Dr. Sahadeo in July of 2001?
6       MR. TEWHEY: Objection.
7   Q.   (By Ms. Mariani) Let me rephrase that.
8       Is it your understanding that AA Medical would not
9   clear you to return to work until it had received a
10  clearance letter from Dr. Sahadeo?
11  A.   I don't know.
12  Q.   Is it your understanding that you would not be
13  returned to work until AA Medical had received letters
14  from your treating physicians?
15  A.   I believe so.
16  Q.   You testified earlier about a conversation with
17  Andee Vallee regarding your return to work and a
18  discussion that she had with AA Medical. And I apologize
19  if I'm rehashing something that we talked about last time,
20  but I want to make sure that I'm clear on it.
21  A.   Mm-hmm.
22  Q.   Did Ms. Vallee say why Medical was not allowing you
23  to return to work?
24  A.   I can't remember if she said, "It's your medicine,"

Page 183

1   or "I think it's your medicine," but she definitely said
2   my medicine, but I don't know if she said "I think" or
3   "is" or -- I don't remember. I'm sorry.
4   Q.   Did anyone else at AA ever mention your medicine to
5   you?
6   A.   No. No one.
7   Q.   Did you ever contact Medical to ask questions about
8   your medicine after you spoke with Ms. Vallee?
9   A.   I don't remember.
10  Q.   If you had, would it be reflected in your notes?
11  A.   Probably not.
12  Q.   And why not?
13  A.   Because 9/11 hit shortly after.
14  Q.   Looking at your notes again, the next page of your
15  notes appears to be dated September 5, 2001. Is that
16  correct?
17  A.   Mm-hmm.
18  Q.   And please correct me if I read this wrong, but I
19  want to make sure we're talking about the same thing here.
20  "September 5, Wednesday, 2001, called Vallee because of no
21  info from med. She had info from med and said because of
22  medicine, I couldn't perform my job. Safety, comma,
23  sensitive function, comma."
24       Did I read that correctly?

13 (Pages 180 to 183)

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II

September 20, 2005

Page 184

1  A.  Yeah.  She said something about that.
2  Q.  Does that note refresh your recollection in any way
3  about your conversation with Ms. Vallee?
4  A.  Yes.  I guess so.  Yeah.  There it is.
5  Q.  Is there anything else that you remember as you sit
6  here today about your conversation with Ms. Vallee on
7  September 5, 2001?
8  A.  That she was going to call someone she knew because
9  the mention about the other people being on medicine that
10 were still working there.
11 Q.  What mention of other people on medicine that were
12 still working?
13 A.  Oh, I can't remember who it was, but there were
14 people that were on medicine, and they were still working
15 and --
16 Q.  Did you discuss the fact that there were people on
17 medicine working --
18 A.  No.
19 Q.  -- with Ms. Vallee?
20 A.  No.  I didn't -- we didn't talk names.  We didn't --
21 but I did say that.
22 Q.  So during the course of your conversation with
23 Ms. Vallee when she informed you that it had to do with
24 your medicine --

Page 185

1  A.  Yes.
2  Q.  -- did you then tell Ms. Vallee that you were aware
3  of other people on medicine working?
4  A.  No.  Couldn't have been that phone call.  Couldn't
5  have been.  Because she was all upset on the last -- that
6  last phone call, that her husband was going in for
7  surgery, and she would get back to me because she knew
8  someone else in -- Sharon Douglas was on vacation.
9     I don't know.  This is all stuff that's just coming
10 into my -- you know what I mean?
11 Q.  So do you remember having another discussion with
12 her after September 5?
13 A.  I can't remember.  She never called me back.  She
14 said, "Give me a couple of days," and -- I can't remember.
15 I think I gave her a couple of days, and she didn't call
16 me back.  Then 9/11 happened.  Then I probably tried
17 calling her, couldn't get through.  It was just a mess.
18 It was a mess.
19    MR. TEWHEY:  Doreen, I want you to let her
20    finish her question before you start answering.
21 A.  Oh, I'm sorry.
22 Q.  (By Ms. Mariani)  Did you contact Medical on or
23 about September 5, 2001?
24 A.  I don't remember.

Page 186

1  Q.  Would it have been important to you to find out the
2  reasons why you weren't being allowed to return to work on
3  or about September 5, 2001?
4  A.  Mm-hmm.
5  Q.  Is that a "yes," ma'am?  I'm sorry.  We just have to
6  create a clear record.
7  A.  Yes.
8  Q.  Since Medical was making the decision, doesn't it
9  make sense to be in touch with Medical about your
10 return-to-work status at that point?
11 A.  Didn't make sense to me because they had done me no
12 good for months and years, so I wasn't about to call them
13 again.  I was just waiting for my letter or whatever it is
14 they do.
15 Q.  So is it fair to say that as of September 5, 2001,
16 you were of the opinion that it made no sense to call
17 Medical anymore?
18 A.  I was under the opinion that -- my opinion was that
19 since Andrea said that it was my medicine, that I would be
20 getting something from the medical department in writing
21    So no.  So I didn't call that day because I didn't
22 have any luck with that nurse there.  She was --
23 Q.  When you didn't receive anything in writing from
24 Medical, did you pick up the phone and call them?

Page 187

1  A.  I don't remember.  I don't remember.
2  Q.  Is it fair to say that you have no memory of
3  contacting Medical after September 5, 2001, to see what
4  the problem was with your medication?
5  A.  No.  It's not fair to say that.
6  Q.  Why not?
7  A.  Because -- because they should have sent me a letter
8  or whatever their procedure is, whatever they do.
9  Q.  But is it fair to say you have no memory of trying
10 to contact AA Medical after September 5, 2001?
11 A.  I have no memory of whether or not I tried calling
12 them after September 5.
13 Q.  Do you remember calling Andee Vallee again after
14 September 5, 2001, to discuss how you could be returned to
15 work?
16 A.  I don't remember if I called her again.
17 Q.  Did Ms. Vallee contact you, to the best of your
18 memory?
19 A.  To the best of my memory, she did not contact me.
20 Q.  Did you contact Sharon Douglas after September 5,
21 2001?
22 A.  I don't remember.
23 Q.  As of September 5, 2001, do you know what your
24 status was officially in terms of Medical?

14 (Pages 184 to 187)

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                                    September 20, 2005

Page 188

1   A.   No.
2   Q.   Did you make any effort to determine what your
3   status was at Medical after September 5, 2001?
4   A.   I don't remember.
5        MR. TEWHEY:  Could we take a break for one
6   second so I could talk to my client?
7        MS. MARIANI:  Okay.
8
9        (A recess was taken.)
10
11       MS. MARIANI:  Back on the record.
12  Q.  (By Ms. Mariani)  You testified earlier that
13  Ms. Hamilton made a comment to you that "We're not as
14  young as we used to be."  Did you ask her for an
15  explanation of that statement?
16  A.   She didn't have to give me one.
17  Q.   How did you understand that statement?
18  A.   She was referring to my back injury.  And when she
19  wanted me to work at the ticket counter, I told her I
20  can't lift bags over -- I forget how many pounds.  And
21  that's when she said that.
22  Q.   Did you have any subsequent discussion with her
23  after she said, "We're not as young as we used to be"?
24  A.   I don't remember.  I don't think so.

Page 189

1   Q.   Was anything else said in that discussion?
2   A.   No.  Oh, that she would lift the bags for me, so I
3   wouldn't have to.
4   Q.   Did she in fact lift the bags for you?
5   A.   No.
6   Q.   Did she have somebody else lift the bags for you?
7   A.   No.
8   Q.   Approximately how old was Ms. Hamilton at that time
9   in relation to you?
10  A.   I don't know.
11  Q.   Do you know if she was older or younger than you?
12  A.   I really don't know.
13  Q.   Do you have an approximation of her age?
14  A.   She might be my age.  I don't know.  She looked
15  good, though.  She was -- you know.  Yeah.  She wasn't
16  older than me.  We're talking, you know, a few years ago,
17  but --
18  Q. *  Can you tell me to the best of your memory exactly
19  what was said during the conversation where Ms. Hamilton
20  used the phrase, "We're not as young as we used to be"?
21  A.   Could you repeat that?
22       MS. MARIANI:  Can you read that question
23  back?
24

Page 190

1        *  (Question read.)
2
3   A.   That's like the same question you just asked me.
4   Q.   (By Ms. Mariani)  Ma'am, I'm asking you to give me
5   to the best of your memory, the exact language used by her
6   and then you in that conversation.
7   A.   Oh.  Well, she told me to work behind the ticket
8   counter, and I told her that I couldn't lift the bags.
9        And she said, "Well, that's okay.  I'll lift them
10  for you."  And that's when the comment was made.  "We're
11  not as young as we used to be."
12  Q.   Anything else that she said after saying "not as
13  young as we used to be"?
14  A.   I don't think.
15  Q.   Anything else that you said after she said, "We're
16  not as young as we used to be"?
17  A.   Not to her face -- no.  No.
18  Q.   Did you say anything behind her back?
19  A.   No.
20  Q.   Now, you testified that you interpreted that comment
21  to refer to your back injury?
22  A.   Yes.
23  Q.   Why?
24  A.   Well, because my back was messed up.  I had

Page 191

1   herniated disks in it.  I was in an awful lot of pain.  So
2   it was a back jab.
3   Q.   So you interpreted the statement to be directed to
4   you rather than at herself; is that correct?
5   A.   Yes.
6   Q.   Is it fair to say that you might have misunderstood
7   what she meant?
8        MR. TEWHEY:  Objection.
9   A.   I don't know.
10  Q.   (By Ms. Mariani)  Is it fair to say you don't know
11  what she intended when making that statement?
12       MR. TEWHEY:  Objection.
13       You can answer.
14  A.   No.  I know that -- what was intended.  I mean, the
15  way I feel it was intended.  That's the way she meant the
16  statement.
17  Q.   (By Ms. Mariani)  So you interpreted it one way.  Do
18  you have any knowledge that that's the way she intended
19  the statement to be made?
20       MR. TEWHEY:  Objection.
21  A.   I wouldn't know that.
22  Q.   (By Ms. Mariani)  Based on your conversations with
23  Medical, did you at any point have an understanding that
24  your return-to-work status was being delayed because your

15 (Pages 188 to 191)

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                          September 20, 2005

---

Page 192

1  doctors hadn't sent in information that AA Medical needed
2  to see?
3  A.  No.
4  Q.  Did Betty ever tell you that you couldn't be cleared
5  to return to work because they hadn't gotten clearance
6  from your physicians?
7  A.  No.
8  Q.  Did you have an understanding that AA Medical needed
9  clearance from your physicians before they could take
10  action on your case?
11  A.  Yes.
12  Q.  And is it your understanding that if your doctors
13  didn't provide information that Medical needed, that would
14  delay Medical's decision?
15  A.  I don't know.
16  Q.  But if Medical couldn't clear you until your doctors
17  had released you, isn't it true that you would be -- your
18  case couldn't be considered until the letters had come in
19  from the doctors?
20  A.  I don't know how that would work.
21  Q.  Did you at any time think that the delay in your
22  returning to work was caused by your own doctors?
23      MR. TEWHEY:  Objection.
24      Answer if you know.

---

Page 193

1  A.  I don't know.
2  Q.  (By Ms. Mariani)  Did it occur to you that the
3  absence of letters from your own doctors could be holding
4  up the process?
5  A.  No.
6      MR. TEWHEY:  Objection.
7  Q.  (By Ms. Mariani)  I'd like you to turn two more
8  pages in the notes that you provided and have been marked
9  as Exhibit 3 to your deposition.  Directing your attention
10  to the note that appears to be dated May 9, 2001, at the
11  bottom of the page, about two thirds of the way down, the
12  note appears to read, "I asked her to have Dr. Y call
13  Dr. S or write him a letter as to what they want."
14      Do you remember having a discussion with AA Medical
15  in which you asked for Dr. Yiannou to write Dr. S -- I
16  assume that's Dr. Sahadeo -- to write a letter to
17  Dr. Sahadeo?
18  A.  What was the question?
19  Q.  Do you remember having a conversation with anyone at
20  AA Medical in which you asked that Dr. Yiannou call
21  Dr. Sahadeo?
22  A.  Yes.
23  Q.  And what do you remember about that conversation?
24  A.  I remember something -- something to do -- she would

---

Page 194

1  never let me talk to the doctor, but she would never have
2  any information.
3      So I asked her, I said, "Well, why can't you just
4  have Dr. Yiannou call Dr. Sahadeo and to let him tell him
5  what -- whatever he needs to tell him?"  That's what I get
6  out of that.  I don't know.
7  Q.  So is it your understanding that as of May 9, 2001,
8  Dr. Yiannou needed information from Dr. Sahadeo?
9  A.  I don't know.
10  Q.  Yet in your May 9 note, you've indicated that you
11  asked her to have Dr. Yiannou call Dr. Sahadeo; is that
12  right?
13  A.  Mm-hmm.  That's what it says.
14  Q.  So at that point in time, Dr. Yiannou needed more
15  information, correct?
16  A.  I don't know why.
17  Q.  Why would you write a note documenting a request to
18  have Dr. Yiannou call Dr. Sahadeo if further information
19  wasn't needed?
20  A.  Can I read --
21  Q.  Sure.
22  A.  -- the rest of this to --
23  Q.  Please do.
24  A.  -- see if I can remember what the heck --

---

Page 195

1      I don't -- I don't know what he needed or what I
2  needed.  I don't remember what that was about.
3  Q.  Do you know if American Medical made requests to
4  your doctors for information about your conditions?
5  A.  Yes.
6  Q.  And do you know if requests were made?
7  A.  They requested -- yes.
8  Q.  So it's fair to say that you knew American Medical
9  requested information from your doctors, correct?
10  A.  Yes.
11  Q.  And do you know if they contacted your doctors
12  directly?
13  A.  No.
14  Q.  Do you know if your doctors responded to requests
15  that Medical made?
16  A.  No.
17  Q.  Directing your attention to the third-to-last page
18  of notes, there appear to be notes dated 5/7, 5/8 and 5/9
19  of 2001.  Do you remember a telephone conversation with
20  Betty on or about May 9, 2001, in which she indicated that
21  Dr. Yiannou was interested in your treating physicians for
22  the past several months?
23  A.  No.
24  Q.  Do you remember her telling you that Dr. S,

---

16 (Pages 192 to 195)

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                    September 20, 2005

---

Page 204

1  A.  Yes.
2  Q.  And how frequently is it that there is no line?
3  A.  Not very frequently.
4      MR. TEWHEY:  Objection.
5  Q.  (By Ms. Mariani)  In your experience, how many times
6  during a shift were you able to sit down when working
7  behind the ticket counter?
8  A.  I don't remember how many times.
9  Q.  Would you say less than five?
10 A.  Yes.
11 Q.  Would you say less than three?
12 A.  No.
13 Q.  Would you say more than three?
14 A.  So you're saying four?  I don't know.
15 Q.  How many breaks were you entitled to take on your
16 shift to begin with?
17 A.  One.
18 Q.  And how long was that break?
19 A.  Fifteen minutes.
20 Q.  And how long was your shift?
21 A.  Six hours.
22 Q.  Were these, the opportunities to sit down, in
23 addition to your usual 15-minute break?
24 A.  Wouldn't be basically sitting down either.  It would

---

Page 205

1  just be -- not going into a room and sitting.  It would --
2  like just around the corner, just like leaning against
3  a -- you know, just so I wouldn't have to stand there
4  so --
5  Q.  When you would take short breaks when working behind
6  the ticket counter, you mentioned you'd go around the
7  corner.
8  A.  Right.
9  Q.  Now, for the record, could you describe the layout
10 of the ticket counter at American when you worked there?
11 A.  Yes.  Had about 20 positions maybe.  And at each
12 end, there would be a door to go into the back office.  So
13 whether I was working up front near the first position or
14 one of the last positions, there was a door that went into
15 the back.
16     Is that clear enough for you?
17 Q.  Yes.  What corner are you referring to when you say
18 you would go around the corner and lean up against
19 something and just not be standing up?
20 A.  It would be like the end, the last position.
21 Q.  So of the 20 positions --
22 A.  Yes.
23 Q.  -- towards that end?
24 A.  I would be as you came in the front door of American

---

Page 206

1  Airlines, and 20 would be where I'm talking about.
2  Q.  Would 20 be closer to or further away from security?
3  A.  Well, it would be further away, but --
4  Q.  From the main security entrance?
5  A.  Yes.  Yes.  Yes.
6  Q.  I'm sorry.  I should have been more clear because I
7  know there are two security stations there.
8  A.  That's okay.  Yeah.
9  Q.  So would 20 be closer toward the entrance near
10 Central Parking?
11 A.  Yes.
12 Q.  When you would round the corner and take a short
13 break, how long would it be that you were away from the
14 actual ticket counter?
15 A.  Two minutes.
16 Q.  You testified earlier about some dealings with Kip
17 Hamilton; is that correct?
18 A.  Yes.
19 Q.  Did Ms. Hamilton -- strike that.
20     I believe you also testified that she was not your
21 supervisor when you went out on leave of absence.  Was she
22 your manager when you went out on leave?
23 A.  I can't remember if she was the -- yes.  She was
24 still there, I believe.  Yes.

---

Page 207

1  Q.  Was she involved in any way with regard to your
2  leave of absence, your first leave of absence?
3  A.  No.
4  Q.  Was she involved in any way with your second leave
5  of absence?
6  A.  Yes.
7  Q.  Okay.  In what way?
8  A.  Well, when she put that portable ticket counter, and
9  when she told me that -- when she told Ms. Konevich that I
10 couldn't work in the office anymore, I feel as though she
11 was connected to what she was pushing me to do against
12 doctor's orders.
13 Q.  So in your mind, working at the portable ticket
14 counter was against doctor's orders?
15 A.  Yes.
16 Q.  And you testified earlier, I believe, that you were
17 given a chair at the portable ticket counter; is that
18 correct?
19 A.  I think so.  But I never sat there.
20 Q.  Was it uncomfortable?
21 A.  It was awful.  Yeah.
22 Q.  And I believe you testified that you never requested
23 another chair; is that right?
24 A.  Yes.

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                    September 20, 2005

---

Page 208

1  Q.   Did you ask either Ms. Konevich or Ms. Hamilton to
2  be reassigned from the portable ticket counter?
3  A.   No.
4  Q.   Did you ever tell Ms. Konevich or Ms. Hamilton your
5  back condition was worsening because of the portable
6  ticket counter?
7  A.   I don't know.
8  Q.   You don't know, or you don't recall?
9  A.   I don't recall.
10 Q.   Who gave you reviews, if anyone, at the time between
11 your first and second leave of absence?
12 A.   What do you mean?
13 Q.   Did anyone review your job performance between your
14 first and second leave of absence?
15 A.   Not that I'm aware of.
16 Q.   Did you receive pay increases between your first and
17 second leave of absence?
18 A.   I don't know.  I don't think so.
19 Q.   Do you recall your pay being decreased at any point
20 in time?
21 A.   No.
22 Q.   At the time you were looking to return from your
23 second leave of absence, was Ms. Hamilton involved in any
24 way with the customer service area at Logan?

---

Page 209

1  A.   No.  I don't think so.
2  Q.   Was Ms. Hamilton involved in any way in evaluating
3  your return to work?
4  A.   I don't believe so.  She wasn't there.
5  Q.   Do you know where she was at that time?
6  A.   I think she went to Connecticut.
7  Q.   So as far as you know, at the time you were seeking
8  to return to work, she was no longer at the Boston
9  station?
10 A.   Right.
11 Q.   At your first deposition, you testified that you'd
12 just begun a new job as a recruiter, and your compensation
13 was part hourly and part commission.  And I believe at
14 that time, you weren't sure what the commission formula
15 was, but I asked you to look into it, and you agreed to do
16 so.  Could you tell me today what the commission formula
17 is for your current position?
18 A.   It's 10 percent.
19 Q.   Ten percent.  And how is that 10 percent calculated?
20 A.   It depends.  Each company has a different formula.
21 Q.   And with each company having a different formula,
22 does that mean that there's a difference in how the
23 10 percent is determined based on salary or length of
24 service?

---

Page 210

1  A.   Yes.
2        Wait.  What do you mean, "length of service"?
3  Q.   Sure.  Does an employee that you've placed have to
4  work for a certain period of time before you receive your
5  commission?
6  A.   Yes.
7  Q.   And does that period of time differ based on the
8  company?
9  A.   That, I'm not sure of.  I don't -- no.  I think it's
10 three months.
11 Q.   So we've established that it looks like it's three
12 months before your commission would be due then, correct?
13 A.   Mm-hmm.
14 Q.   When you say the amount varies based on the company,
15 based on the salary, what do you mean?
16 A.   Just have a lump sum value, what they pay us.  And
17 others, it's a percentage of the yearly wage that the
18 person makes.
19 Q.   And when you say lump sum, are you referring to a
20 set amount that your company receives from the company to
21 whom the placement has been made?
22 A.   Correct.
23 Q.   And the other system is your company receives a
24 percentage of the amount of the employee's earnings for

---

Page 211

1  that year, projected earnings, correct?
2  A.   Yes.
3  Q.   And you receive 10 percent of what your company
4  receives, correct?
5  A.   Correct.
6  Q.   Just wanted to make sure I had that clear.
7        Could you tell me, Mrs. Cerra, why you decided to
8  file a lawsuit against American Airlines?  And I'm not
9  asking for any conversations you had with Attorney Tewhey.
10 I'm asking for your personal reasons.
11       MR. TEWHEY:  I'm going to object.
12       You can answer.
13 A.   Well, I have no college education.  That's all I've
14 done my whole life.  I lost insurance, house, cars.
15 Q.   (By Ms. Mariani)  What action or actions by American
16 Airlines, in your mind, caused you to lose the things
17 you've just mentioned?
18       MR. TEWHEY:  Objection.
19       You can answer.
20 A.   By not following the procedures that they have.
21 Q. *  (By Ms. Mariani)  And that's the procedures with
22 regard to your return to work?
23 A. *  Yeah.  The whole thing.  The procedures of when I
24 got hurt.  They -- I was supposed to be given an injury

---

20 (Pages 208 to 211)

Case 1:04-cv-12095-RGS     Document 9-3     Filed 02/03/2006     Page 21 of 26

Doreen Cerra vs. American Airlines, Inc.
Doreen E. Cerra - Day 2 - Volume II                     September 20, 2005

## Page 212

1 counselor. I was never given an injury counselor. I
2 still don't know who put me out on medical leave, because
3 they said they found my file three years later. And then
4 trying to get my job back. It's been a living hell.
5 Q.   You've mentioned three things, and I want to make
6 sure that this is what we're talking about. You mentioned
7 that American didn't give you an injury counselor, that
8 they put you on medical leave and that they didn't follow
9 through with their return-to-work procedures.
10      Anything else that you can think of that is the
11 basis of why you decided to file a lawsuit?
12      MR. TEWHEY: Objection.
13 A.   They took my life away. I mean, they took my
14 earnings away. They made me feel less of a person. My
15 credit's ruined. I've spent every cent of money that I
16 ever had. I can't afford to put my kid through college
17 because I spent her money.
18      And you know, the thing is I was hurt performing my
19 job, the job that I loved, the job that I went to every
20 single day. And then -- I don't know. Just because of my
21 age, my pay -- I don't know why they wouldn't take me
22 back. I don't know why. I don't know what happened. I
23 really honestly do not know.
24      MR. TEWHEY: Can we take a break for a

## Page 213

1 second?
2      MS. MARIANI: Yes. Let's take a break for
3 a couple of minutes.
4
5           (A recess was taken.)
6
7      MS. MARIANI: Back on the record.
8 Q.   (By Ms. Mariani) You mentioned three specific
9 things before: The fact that you did not have an injury
10 counselor, the fact that you were placed on medical leave
11 and the fact that you encountered difficulties in trying
12 to return to work. Are there any other procedures or
13 processes that you think went wrong at American in your
14 case?
15      MR. TEWHEY: Objection.
16      You can answer.
17 A.   As far as the procedures go?
18 Q.   (By Ms. Mariani) Correct.
19 A.   I was never called by any member of management,
20 supervisors.
21      I'm just trying to think, but --
22      I never got the letter from the medical department
23 stating what the reason was I couldn't return. Just the
24 length of time that it took to get responses. I couldn't

## Page 214

1 appeal anything because I never got a letter of why I
2 wasn't reinstated or --
3      That's all I can think of.
4 Q.   I want to tackle each one of those individually and
5 get a little more information from you about them. Let's
6 actually take the last one first because I think there are
7 a couple of things that fold in there.
8      When you say you couldn't appeal anything because
9 you didn't get a letter, does that have to do with your
10 return-to-work process?
11      Yes, ma'am?
12 A.   Yes. Yes.
13 Q.   And when you say you had an issue with the length of
14 time it took to get responses, does that again deal with
15 just the return to work?
16 A.   No.
17 Q.   What else does that deal with?
18 A.   When I went out on a leave of absence, it took
19 several months to get any money from the insurance
20 company.
21 Q.   Anything besides the length of time it took to get
22 money from the insurance company and the length of time to
23 process your return to work?
24 A.   Could you repeat that?

## Page 215

1 Q.   Sure. Is there anything else besides the insurance
2 and the return to work that took too long, in your mind?
3 A.   I don't think so.
4 Q.   When you said that you didn't receive a letter from
5 Medical, does that again have to do with the
6 return-to-work process?
7 A.   Yes.
8 Q.   And when you say you were never called by
9 management, what are you referring to then?
10 A.   They're supposed to call during your leave to see
11 what your status is.
12 Q.   When you say you have no injury counselor, could you
13 describe for me what your understanding is of who the
14 injury counselor should be?
15      MR. TEWHEY: Objection.
16      You can answer.
17 A.   When I first got hurt, they had implemented a
18 program where they would have a liaison between Medical
19 and your supervisor, and they would go back and forth,
20 like, to let your supervisor know what's going on. And I
21 think I was supposed to have one. They never gave me one.
22 Q.   (By Ms. Mariani) Do you know who was supposed to be
23 your injury counselor?
24 A.   No.

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                         September 20, 2005

## Page 216

1  Q.  Do you know by position who held the job of injury
2  counselor?
3  A.  I think that they have a whole department in Dallas.
4  Q.  Do you know whether it's a department that's run by
5  American or run by the insurer?
6  A.  By American.
7  Q.  And how do you know that?
8  A.  Because it was in the company newspaper.
9  Q.  Do you remember when it was in the company
10  newspaper?
11  A.  Let's see. It might have been -- no. I don't
12  remember.
13  Q.  Do you remember if it was before your first leave?
14  A.  No, but I have it at home. I can find out for you.
15  Q.  If you could do that, I would appreciate that, and
16  pass the information along to your attorney.
17  A.  Sure.
18  Q.  Were you assigned someone from the insurance company
19  to work with you with regard to your workers' compensation
20  claim?
21       MR. TEWHEY: Objection.
22       You can answer.
23  A.  No. I don't know who she -- there was somebody, but
24  I don't know who she worked for.

## Page 217

1  Q.  (By Ms. Mariani) When you say there was somebody,
2  would you describe the somebody to me?
3  A.  The somebody was maybe a nurse or case handler or
4  something.
5  Q.  Was that somebody at the insurance company?
6  A.  I don't know.
7  Q.  What did this person do for you?
8  A.  Just called to see how I was doing.
9  Q.  Anyone else communicate with you regarding your
10  workers' compensation leave?
11  A.  No.
12  Q.  When you said she would call to see how you were
13  doing, what kinds of things would she ask you?
14  A.  "How are you feeling? What did your doctor say?"
15  Things like that.
16  Q.  Was this person in communication with AA Medical?
17  A.  I don't know.
18  Q.  Was this person in communication with your
19  supervisor?
20  A.  I don't know.
21  Q.  Did you have an understanding as to what her role
22  was with regard to your workers' compensation benefits?
23  A.  I think she was a nurse, but I don't know who she
24  worked for.

## Page 218

1  Q.  So do you have an understanding as to why she was
2  getting in touch with you?
3  A.  No, I don't. But I was sure glad someone cared
4  about me.
5  Q.  You said that one of the other things that you
6  believe went wrong was you were placed on medical leave.
7  What do you mean by that?
8       MR. TEWHEY: Objection.
9       THE WITNESS: What did I say?
10      MR. TEWHEY: I'm not sure that's what she
11  testified to.
12  Q.  (By Ms. Mariani) You testified earlier -- and I
13  think I have your words down here -- that you were upset
14  because they put you on medical leave. Could you tell me
15  what you meant when you said you were put on medical
16  leave?
17  A.  No.
18      MR. TEWHEY: Objection. I don't think
19  that's what she said. I think what she said
20  was --
21      MS. MARIANI: Why don't we actually let the
22  court reporter go back to the appropriate
23  testimony and read that back, if you don't
24  mind.

## Page 219

1
2       *  (Question and answer at Page 211, Line 20
3          through Page 212, Line 3 read.)
4
5  Q.  (By Ms. Mariani) Now that the court reporter has
6  refreshed all of our recollections, could you tell me what
7  you meant when you talked about being put out on medical
8  leave?
9       MR. TEWHEY: Again, I'm going to object --
10      MS. MARIANI: The question is pending, and
11  if you have a problem with the form, you can
12  object to the form.
13      MR. TEWHEY: I'll object to the form.
14  Q.  (By Ms. Mariani) You may answer the question.
15  A.  I don't understand the question.
16  Q.  Did you hear the court reporter read back an excerpt
17  of your previous testimony in which you mentioned that you
18  don't know who put you out on medical leave?
19  A.  Yes.
20  Q.  What did you mean when you said you didn't know who
21  put you out on medical leave?
22  A.  Oh. Because the medical department's supposed to
23  put you out on medical leave and they told me several
24  years later that they had just found my file while they

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                                    September 20, 2005

Page 236

1   A.   Not that I'm aware of.
2   Q.   Do you know when AA sent those forms to your
3   doctors?
4   A.   No, I don't.
5   Q.   Do you know if your doctor sent those forms back?
6   A.   No, I don't.
7   Q.   Other than the forms, are you aware of any
8   communications between the doctors and AA Medical?
9   A.   No.
10  Q.   You mentioned earlier that another reason why you
11  thought the return-to-work procedure had not worked in
12  your case was because since you had no letter, you
13  couldn't appeal. Could you tell me what you meant when
14  you said you couldn't appeal without a letter?
15  A.   It's my understanding when I read it, and it's been
16  some time since I've read the -- that part of the process
17  to get back, that as soon as your doctor sends your
18  clearance in to the medical department, they have a review
19  board in Dallas, made up of several doctors or a couple --
20  I don't know how many. It just said there's a board of
21  doctors.
22        And when New York Medical sends them my file, there
23  is a decision made whether or not I can be reinstated for
24  work. When there is a decision made that they disagree

Page 237

1   with my doctor saying that I can -- they say I can't --
2   then I can appeal.
3   Q.   And again, your understanding comes from documents
4   that you reviewed in NavigAAtor; is that correct?
5   A.   That's right.
6   Q.   Do you know what the appeal process was?
7   A.   That -- no, I don't.
8   Q.   Did you ever seek to appeal, even though you didn't
9   have a letter?
10  A.   No, I didn't.
11  Q.   You testified earlier that you became aware that
12  there was a problem with your medications on or about
13  September 5, 2001. When you learned that there was a
14  problem with your medications that would prevent you from
15  returning to work, did that decision upset you?
16       MR. TEWHEY: Objection.
17  A.   Yeah.
18  Q.   (By Ms. Mariani) Why did it upset you?
19  A.   Well, because everybody's on medication. The whole
20  world's on medication. And they're all working.
21  Q.   So is it fair to say that you would have -- you were
22  upset because other people were permitted to work on
23  medication, while you in your circumstances were not?
24  A.   Right. If this were the case, that it were the

Page 238

1   medication. I don't even --
2   Q.   Is it fair to say that you don't have an
3   understanding as to what medication other people are on?
4   A.   Yes. I don't know.
5   Q.   And would you agree that different medications have
6   different side effects?
7   A.   Yes.
8   Q.   And would you agree that some medications may not
9   affect an individual's ability to work, while others
10  might?
11  A.   Yes.
12  Q.   Other than the ways that we have discussed earlier
13  with respect to the injury counselor, with respect to
14  being placed on medical leave and with respect to your
15  return to work, do you feel that AA did not accommodate
16  you in some way?
17  A.   Yes, I do.
18  Q.   How?
19       MR. TEWHEY: Objection.
20       You can answer.
21  A.   By not having their management follow the procedures
22  that headquarters spends thousands and millions of dollars
23  on. I'm not saying every -- you know, but I -- that's
24  what I think, that -- I don't know.

Page 239

1   Q.   (By Ms. Mariani) Anything else besides a failure to
2   follow procedures that you believe is a failure on AA's
3   part to accommodate you?
4   A.   No.
5   Q.   Now, in your lawsuit, you've claimed two things:
6   age discrimination and handicapped discrimination,
7   correct?
8   A.   Yes.
9   Q.   Could you tell me what facts you have that lead you
10  to believe that you were discriminated against on the
11  basis of age?
12       MR. TEWHEY: Objection.
13  A.   Well, while I was out on my injury, there were
14  positions being filled that did not require driving the
15  jet bridge, for instance.
16  Q.   (By Ms. Mariani) What positions were those?
17  A.   There were reservation positions. There were PSR
18  positions. Admirals Club positions.
19  Q.   Those positions are different from that of a
20  passenger service agent, correct?
21  A.   Yes.
22  Q.   And why do you feel that those positions being
23  filled while you were out on injury leave discriminated
24  against you based on your age?

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                    September 20, 2005

### Page 240

1  A.  Because they were -- the pay would be three times
2  lower than what I was making.
3  Q.  So how does it -- how is it discriminating against
4  you to hire somebody at lower pay when you were still on
5  the payroll officially?
6  A.  How does it what?
7  Q.  How does it discriminate against you to hire
8  reservations agents, PSRs or Admirals Club agents who are
9  being paid less than you are while you're still an AA
10  employee?
11      MR. TEWHEY: Objection.
12      You can answer.
13  A.  I don't even understand what you're talking about.
14  Q.  (By Ms. Mariani)  You testified that you believed
15  you were discriminated against based on your age because
16  positions were filled while you were out on injury leave.
17  While you were on injury leave, you were still an AA
18  employee, correct?
19  A.  Mm-hmm.
20  Q.  You have got to answer yes or no for the record.
21  A.  Yes.
22  Q.  And how does it discriminate against you to fill
23  positions that pay less while you were still an AA
24  employee?

### Page 241

1  A.  Well, I guess what -- let me see.  I don't know if I
2  understood the question before this question then because
3  that doesn't make sense to me.
4  Q.  Why do you think you were discriminated against
5  based on your age?
6  A.  Because I made too much money.  I got hurt.  And
7  they would have to bring me back at what I was making.
8  Q.  So are you saying that you believe you weren't
9  brought back because of your age and what you were making?
10  A.  Yeah.  I believe that.
11  Q.  And why do you believe that?
12  A.  Because I would have been brought back before.
13  Q.  When you say you would have been brought back
14  before, when are you talking about?
15  A.  Prior to this lawsuit being filed.
16  Q.  Before your leave of absence ended?
17  A.  Yes.
18  Q.  What facts do you have to support your claim that
19  you were not brought back because of your age and your
20  pay?
21      MR. TEWHEY: Objection.
22      You may answer.
23  Q.  (By Ms. Mariani)  Let me break it down.  What facts
24  do you have to support your claim that you were not

### Page 242

1  brought back because of your age?
2      MR. TEWHEY: Objection.
3      You may answer.
4  A.  I don't know.
5  Q.  (By Ms. Mariani)  What facts do you have to support
6  your claim that you were not brought back because of your
7  pay?
8  A.  Just that they can hire more people.
9  Q.  The reservation positions, the PSR positions and the
10  Admirals Club positions?
11  A.  Agents.  Everything.  The whole thing.
12  Q.  Do you know that agents have been hired since your
13  leave of absence ended?
14      MR. TEWHEY: Objection.
15      You can answer.
16  A.  Yes.
17  Q.  (By Ms. Mariani)  You know that passenger service
18  agents have been hired since that time?
19  A.  Since my leave of absence?
20  Q.  Since your leave of absence ended.
21  A.  Yes.
22  Q.  And how do you know that passenger service agents
23  have been hired since your leave of absence ended?
24  A.  They had it in the newspaper.

### Page 243

1  Q.  When you say they had it in the newspaper, what are
2  you referring to?
3  A.  American had it in the paper, that they were hiring.
4  Q.  And do you have a copy of that ad?
5  A.  Yes.  At home.
6  Q.  Do you remember when that ad ran?
7  A.  No.
8  Q.  Do you remember the positions that were advertised
9  in that ad?
10  A.  No.
11  Q.  Do you remember specifically that passenger service
12  agents were advertised for in that ad?
13  A.  Yes.
14  Q.  Do you know if anyone was hired in connection with
15  that ad?
16  A.  No.
17  Q.  Are there any other reasons besides what you've just
18  given me why you believe you were discriminated against on
19  the basis of age?
20  A.  Well, I believe that because of my age, because of
21  the length of time that I worked there, because of my
22  injury, they didn't have much use for me as a ticket
23  agent.  That's what I think.
24  Q.  When you say, "They didn't have much use for me as a

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

Doreen Cerra vs. American Airlines, Inc.

Doreen E. Cerra - Day 2 - Volume II                    September 20, 2005

---

### Page 244

1  ticket agent," what do you mean?
2  A.  Well, as far as physical functions go.  That's it.
3  Q.  Now, you had been cleared by Dr. Farber to return to
4  work without any physical restrictions; is that right?
5  A.  Yes.
6  Q.  So given the fact that you had been returned to work
7  without any physical restrictions, why do you believe that
8  your injury in the past was a reason to not return you to
9  work?
10  A.  Why do I believe what?
11  Q.  Why do you believe that you were not returned to
12  work when you had been cleared to return physically?
13  A.  I don't know.
14  Q.  Do you have any evidence that you were replaced at
15  American Airlines?
16  A.  No.
17  Q.  Do you know, if you were at AA at the time after
18  9/11, whether or not you would have been subject to the
19  same job reductions and furloughs that American Airlines
20  employees were subject to at that time?
21       MR. TEWHEY:  Objection.
22       You can answer.
23  A.  I wouldn't have been subjected to furloughs.
24  Q.  (By Ms. Mariani)  And that's because of your

---

### Page 245

1  seniority?
2  A.  Yes.
3  Q.  Could you tell me why you believe you've been
4  discriminated against based on a handicap or disability?
5       MR. TEWHEY:  Objection.
6  A.  No.
7  Q.  (By Ms. Mariani)  What do you think American was
8  obligated to do differently, if anything, besides what we
9  talked about with respect to the injury counselor, the
10  putting you on medical leave issue and the return-to-work
11  issue?
12       MR. TEWHEY:  Objection.
13       You can answer.
14  A.  Could have offered me another job.
15  Q.  (By Ms. Mariani)  Did you apply for another job?
16  A.  No.
17  Q.  Did anyone at AA suggest you apply for another job?
18  A.  No.
19  Q.  When you say they could have offered you another
20  job, what do you mean?  What job?
21  A.  If the reason they didn't reinstate me was because
22  of my medicine, they could have -- and they could have
23  offered me one of many jobs that did not involve the
24  things that they said I couldn't do, as I could have done

---

### Page 246

1  reservations.  I could have worked in the Admirals Club.
2  I could have worked in the city ticket office.  I could
3  have worked in operations.  None of those jobs require
4  what they said I couldn't do.
5  Q.  What did they say you couldn't do?
6  A.  Well, just in your job description, they said the
7  medicine and -- I don't know.
8  Q.  When you say --
9  A.  I could have done everything myself, but --
10  Q.  You just testified that they said you couldn't do
11  something.  What specifically did they say you couldn't
12  do?
13  A.  They said that I couldn't operate a jet bridge.
14  Q.  Now, reservations positions are different from that
15  of passenger service agents, correct?
16  A.  Yes.
17  Q.  And Admirals Club positions are as well?
18  A.  Yes.
19  Q.  City ticket office is different from passenger
20  service agent, isn't it?
21  A.  Yes.
22  Q.  And operations positions are different as well,
23  correct?
24  A.  Correct.

---

### Page 247

1  Q.  The pay levels for each of those positions is
2  different, aren't they?
3  A.  Yes.
4  Q.  And the hiring process for each of those positions
5  is different, isn't it?
6       MR. TEWHEY:  Objection.
7  A.  I don't know.
8  Q.  (By Ms. Mariani)  Is it fair to say you don't know
9  what the job skills required for each of those positions
10  are?
11       MR. TEWHEY:  Objection.
12  Q.  (By Ms. Mariani)  Let me rephrase that.
13       Have you seen a job description for the position of
14  reservations agent?
15  A.  No.
16  Q.  Have you seen a job description for the position of
17  Admirals Club representative?
18  A.  No.
19  Q.  Have you seen a job description for agent at the
20  city ticket office?
21  A.  Yes.
22  Q.  And when did you see a job description for that
23  position?
24  A.  When I worked there.

---

Doreen Cerra vs. American Airlines, Inc.
Doreen E. Cerra - Day 2 - Volume II                                    September 20, 2005

Page 248

1   Q.   When did you work there?
2   A.   In the '80s. I also worked in the other two
3   positions, too. So somewhere along the line, I guess I
4   saw job descriptions.
5   Q.   But as of the time your leave of absence ended, is
6   it fair to say you did not know the job descriptions
7   for each of those positions entailed?
8        MR. TEWHEY: Objection.
9   A.   I don't know.
10  Q.   (By Ms. Mariani) When you say, "I don't know," did
11  you have an understanding as to the job descriptions for
12  any of those positions as of the time your leave of
13  absence ended?
14  A.   Did I what?
15  Q.   Did you have an understanding as to what the job
16  descriptions said for any of those positions at that time?
17  A.   Oh, I have an idea of what they all said.
18  Q.   And is your idea based upon your experience at
19  American Airlines?
20  A.   Yes.
21  Q.   It's not based on actually seeing a job description
22  around the time of the end of your leave of absence,
23  though, is it?
24       MR. TEWHEY: Objection.

Page 249

1   A.   No.
2   Q.   (By Ms. Mariani) At the time your leave of absence
3   ended, do you know whether or not the city ticket office
4   was open?
5   A.   No.
6   Q.   So is it fair to say that city ticket office would
7   not be a possible job for you if it had in fact closed by
8   that point?
9        MR. TEWHEY: Objection.
10  A.   I don't know.
11  Q.   (By Ms. Mariani) Other than offering you another
12  job, what do you think AA could have done differently, if
13  anything?
14  A.   Just follow their own procedures that they wrote.
15  Q.   And those are the things that we've discussed
16  previously?
17  A.   Yes. And more that I'll -- you know, I have it at
18  home, about the -- getting --
19  Q.   The procedures --
20  A.   Yes.
21  Q.   -- that you mentioned --
22  A.   Yes.
23  Q.   -- in NavigAAtor?
24  A.   Right.

Page 250

1   Q.   Any other specific procedures besides those you've
2   mentioned in NavigAAtor that you believe they didn't
3   follow other than what we've discussed?
4   A.   Well, yes. They -- they're always talking about --
5   they were always talking about kindness, human kindness
6   to one another, and I didn't get any of that from the
7   medical department. It's just like I said -- I'm sorry.
8   I'm just reading way too much into this, and it's -- I
9   guess it's just because I'm a kind person, and I wouldn't
10  show anybody the kind of treatment that was given to me.
11  Q.   Any other policies besides the goal of kindness that
12  you mentioned?
13  A.   I don't think so.
14       MS. MARIANI: Why don't we take a break for
15       a couple of minutes, and I think we can
16       probably wrap up pretty soon.
17
18            (A recess was taken.)
19
20       MS. MARIANI: Back on the record.
21  Q.   (By Ms. Mariani) Ms. Cerra, we talked a little bit
22  before about how management didn't follow up with you
23  while you were out on leave of absence. What, if
24  anything, do you think would have been different, had

Page 251

1   management followed up with you?
2        MR. TEWHEY: Objection.
3   A.   I don't think any of us would be sitting here today.
4   Q.   (By Ms. Mariani) Why?
5   A.   Because I don't think that I would have got all of
6   this depression and -- I think it would have been
7   different if they had followed procedures.
8   Q.   And what specifically do you think would have been
9   different?
10  A.   I would be working in my job.
11  Q.   Why do you believe you'd be working?
12  A.   Because I was a good employee.
13  Q.   Do you believe that if management had followed up,
14  it would have changed Medical's decision?
15  A.   I don't know.
16  Q.   You also testified earlier that you believed your
17  pay and seniority level had something to do with your not
18  being returned to work; is that correct?
19  A.   Yes.
20  Q.   Do you know the age distribution of the PSAs at
21  Logan at the time your leave of absence ended?
22       MR. TEWHEY: Objection.
23  A.   I don't know what you're talking about.
24  Q.   (By Ms. Mariani) Do you know the age range of the

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting