# Womesh C. Sahadeo, M.D., P.A.



PALM BEACH PSYCHIATRIC AND ADDICTION CENTER
5681 CORPORATE WAY • SUITE #4
WEST PALM BEACH, FL 33407
561-640-0200 • FAX 561-640-6193

July 25, 2001

American Airlines
ATTN: Medical Department

To Whom It May Concern:

This letter is to certify that Doreen Cerra has been under my care since January 7, 2000. Doreen presented very depressed and had difficulty concentrating. She was not functioning. Doreen's present medications are: Effexor 100mg twice per day, Celexa 60 mg per day, Restoril 15 mg at bedtime, and Xanax 1mg every 4 hours as needed.

Doreen has responded very well to her current medications. Her prognosis is good. She is currently functioning at full capacity and may return to work with no restrictions regarding her Psychiatric abilities.

If you have any further questions regarding this information please feel free to contact me at the above phone or address.

Sincerely,

Womesh C. Sahadeo, M.D.

RECEIVED

JUL 2 5 2001

JFK MEDICAL

**EXHIBIT 2**

Case 1:04-cv-12095-RGS    Document 14    Filed 03/13/2006    Page 3 of 27

Doreen Cerra vs. American Airlines, Inc.
Doreen E. Cerra - Day 2 - Volume II                September 20, 2005

Volume: II
Pages: 135-262

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-12095 RGS

```
                        |
DOREEN CERRA,           |
                        |
           Plaintiff    |
                        |
vs.                     |
                        |
AMERICAN AIRLINES,      |
                        |
           Defendant    |
_____|
```

DAY 2 - VOLUME II

CONTINUED DEPOSITION OF:  DOREEN E. CERRA

FITZHUGH, PARKER & ALVARO, LLP

155 Federal Street

Suite 1700

Boston, MA 02110-1727

September 20, 2005

Virginia Dodge
Registered Professional Reporter
DUNN & GOUDREAU

APPEARANCES:


Representing the Plaintiff:

        LAW OFFICE OF JAMES R. TEWHEY
        19 North Street
        Salem, MA 01970-3970
        BY:  JAMES R. TEWHEY, ESQ.
        (978) 741-2255


Representing the Defendant:

        FITZHUGH, PARKER & ALVARO, LLP
        155 Federal Street
        Suite 1700
        Boston, MA 02110-1727
        BY:  AMY CASHORE MARIANI, ESQ.
        (617) 695-2330

        and

        AMERICAN AIRLINES
        4333 Amon Carter Boulevard
        MD 5675
        Fort Worth, TX 76155
        BY:  DAVID W. STRICKLER, ESQ.
        (817) 967-1116

```
                        I N D E X


WITNESS:            DOREEN E. CERRA


                   DIRECT    CROSS    REDIRECT    RECROSS

By Ms. Mariani     138                  258

By Mr. Tewhey                254
```

```
EXHIBIT                                              PAGE

Exhibit 1, Airport Agent - Part 1.....................142

Exhibit 2, Injury on Duty Leave of Absence............157

Exhibit 3, Handwritten notes..........................165

Exhibit 4, Letter dated July 25, 2001.................180
```

| 1  | opportunity to review what's been marked as Exhibit 2? |
|----|----|
| 2  | A.   Yes. |
| 3  | Q.   And is the document familiar to you? |
| 4  | A.   Yes. |
| 5  | Q.   How is it familiar to you? |
| 6  | A.   I've seen it somewhere in the past few years. |
| 7  | Q.   Had you reviewed this document while you were |
| 8  | employed at AA? |
| 9  | A.   Do you mean when I was on leave of absence? |
| 10 | Q.   Correct.  While you remained employed, but on leave |
| 11 | of absence at AA. |
| 12 | A.   I can't remember. |
| 13 | Q.   Directing your attention to the second paragraph, |
| 14 | the section entitled Employee Responsibility.  Do you see |
| 15 | that section? |
| 16 | A.   Mm-hmm. |
| 17 | Q.   Were you aware, as is stated in the first paragraph |
| 18 | of that section, that injury-on-duty leaves of absence |
| 19 | could not exceed five years under company policy? |
| 20 | A.   Yes. |
| 21 | Q.   And was that your understanding at the time you went |
| 22 | out on leave of absence? |
| 23 | A.   I didn't know at that time. |
| 24 | Q.   At some point during your leave of absence, did you |

| 1 | become aware that company policy was to limit leaves of |
| 2 | absence to five years? |
| 3 | A.    Yes. |
| 4 | Q.    And do you recall how you became aware of that? |
| 5 | A.    Not really.  I talked to my friend who lived down |
| 6 | the street, was a flight attendant for American, |
| 7 | because -- yeah.  She told me. |
| 8 | Q.    Now, at some point in time, did you seek to -- we |
| 9 | talked the last day of your deposition that you did seek |
| 10 | to return to work from a leave of absence; is that |
| 11 | correct? |
| 12 | A.    Yes. |
| 13 | Q.    And what is your understanding of what you had to do |
| 14 | to get back to work? |
| 15 | A.    To contact the human resources and find out how I |
| 16 | get back to work. |
| 17 | Q.    And I believe you testified that you did in fact |
| 18 | speak with Sharon Douglas about the steps that you needed |
| 19 | to take to get back to work; is that correct? |
| 20 | A.    Correct. |
| 21 | Q.    And I believe you also testified that she advised |
| 22 | you to consult with the person who would then be your |
| 23 | supervisor, Andee Vallee; is that right? |
| 24 | A.    No. |

| | |
|---|---|
| 1 | Q.    What is your recollection about what Ms. Douglas |
| 2 | told you?  And I apologize if we're rehashing -- |
| 3 | A.    It's okay.  I know.  I'm trying to remember from all |
| 4 | those years ago, to be honest with you. |
| 5 | Let's see.  Sharon Douglas told me that I would have |
| 6 | to get cleared through the medical department. |
| 7 | Q.    And you testified at your last day of deposition |
| 8 | that you did in fact contact Medical; is that correct? |
| 9 | A.    Yes. |
| 10 | Q.    And I believe you testified also at your last day of |
| 11 | deposition that you never heard back from Medical; is that |
| 12 | right? |
| 13 | A.    Well, I heard back from them.  I don't know if it |
| 14 | was the same phone call or -- |
| 15 | Q.    Could you tell me what you heard back from Medical? |
| 16 | A.    I'm sorry.  I can't remember at this time what. |
| 17 | Q.    Did Medical ever tell you that you were not cleared |
| 18 | to return to work? |
| 19 | A.    No. |
| 20 | Q.    Did anyone ever tell you you were not cleared to |
| 21 | return to work? |
| 22 | A.    Yes. |
| 23 | Q.    And was that Andee Vallee in the conversation you |
| 24 | discussed -- |

| 1 | A. | Yeah. |
|---|----|-------|
| 2 | Q. | -- at our last deposition day? |
| 3 | A. | Yes. |
| 4 | Q. | Did anyone else at AA ever tell you you were not |
| 5 | | cleared to return back to work? |
| 6 | A. | There was a nurse by the name of Susan that told me |
| 7 | | I would not be cleared for a long, long time. |
| 8 | Q. | And where was Susan's location? |
| 9 | A. | New York. |
| 10 | Q. | Do you recall when you spoke with Susan? |
| 11 | A. | No. |
| 12 | Q. | Did Susan say anything besides that you would not be |
| 13 | | cleared for a long, long time? |
| 14 | A. | That she would have Betty call me. |
| 15 | Q. | And did Betty ever call you? |
| 16 | A. | Yes. |
| 17 | Q. | And do you recall when Betty called you? |
| 18 | A. | No. |
| 19 | Q. | What, if anything, did you do after hearing from |
| 20 | | Susan that you would not be cleared for a long, long time? |
| 21 | A. | Continued to try to get my clearance. |
| 22 | Q. | What steps did you take to continue to try to get |
| 23 | | your clearance? |
| 24 | A. | Called Medical, got my letters from my doctors that |

DUNN & GOUDREAU

```
 1   they said I needed.  Called Medical again.  Several calls
 2   to the medical department.
 3   Q.    Over what period of time did these calls to the
 4   medical department take place?
 5   A.    I don't remember.
 6   Q.    Do you know whether you could have appealed
 7   Medical's conclusion that you were not cleared to return
 8   to work?
 9   A.    Did I know if I could have appealed?
10   Q.    Yes.
11   A.    Yes.
12   Q.    And what was your understanding of the process that
13   you would use to appeal?
14   A.    That first, they would have to tell me why they
15   wouldn't reinstate me.
16   Q.    Okay.  And to the best of your knowledge, did
17   Medical tell you why they wouldn't reinstate you?
18   A.    To the best of my knowledge, no, they never told me
19   why I was not reinstated.
20   Q.    You mentioned a few minutes ago that Susan told you
21   it was because of your medicines; is that right?
22   A.    No.
23   Q.    What did Susan tell you specifically?
24   A.    Just that it would be a long, long, long time.
```

DUNN & GOUDREAU

```
1   Q.   After learning that you were not cleared to return
2   to work, what step would be next in the appeals process,
3   in your understanding?
4   A.   I don't know.
5   Q.   Other than making phone calls to Medical, what other
6   steps, if any, did you take to clarify your situation?
7   A.   Contacted my lawyer.  Had my doctors write clearance
8   letters.
9   Q.   Were your doctors provided with the document that
10  we've reviewed as Exhibit 1 to your deposition?
11  A.   Yes.
12  Q.   And at the time that you sought to return to work, I
13  believe you testified that you were on several
14  medications; is that correct?
15  A.   Mm-hmm.
16  Q.   And I believe you testified at your last deposition
17  that several of them had warning labels on them regarding
18  drowsiness; is that correct?
19  A.   Yes.
20  Q.   Did you contact Andee Vallee to see if there were
21  any steps that could be taken to return you to work with
22  some kind of accommodation?
23  A.   Yes.
24  Q.   When did you contact Ms. Vallee to make such a
```

| 1 | request? |
|---|---|
| 2 | A.    In September. |
| 3 | Q.    Of what year? |
| 4 | A.    '01. |
| 5 | Q.    What do you recall about that conversation? |
| 6 | A.    That she would call me back. |
| 7 | Q.    And what do you remember requesting that she do? |
| 8 | A.    She was going to find out why they would not let me |
| 9 | return to work. |
| 10 | Q.    Did she in fact find out why they would not let you |
| 11 | return to work? |
| 12 | A.    I don't know. |
| 13 | Q.    Did you have any further conversations with |
| 14 | Ms. Vallee? |
| 15 | A.    Not that I -- I don't remember. |
| 16 | Q.    During your conversation with Ms. Vallee, did you |
| 17 | ask her to do anything besides to look into why you were |
| 18 | not being permitted to return to work? |
| 19 | A.    No. |
| 20 | Q.    Did you ask her to see if any modifications could be |
| 21 | made that would allow you to return to work? |
| 22 | A.    We never got that far because she wasn't aware of |
| 23 | the reason I could not return to work herself. |
| 24 | Q.    Did you make any request of Sharon Douglas for a |

```
 1    testified at your last day of deposition that Ms. Hamilton
 2    was your supervisor at the time you first went out on
 3    injury-on-duty leave; is that correct?
 4    A.    No.
 5    Q.    Was Ms. Hamilton your manager at some point in time?
 6    A.    She was a passenger service manager.  She was a head
 7    of the supervisors.  She was the supervisors' boss.
 8    Q.    So at the time you went out on injury-on-duty leave,
 9    she was your boss's boss?
10    A.    I can't remember if she was still there when I went
11    out on injury-on-duty.  You'd have to --
12    Q.    Directing your attention to the middle of the page,
13    the note appears to read -- and please correct me if I
14    read this wrong -- "Kip Hamilton MGR ECRO.  Not as young
15    as we used to be, exclamation point.  Threatened Konevich
16    with her job."
17         Could you tell me what that refers to?
18    A.    Yes.  She told me -- when I was doing light duty, my
19    doctor told her that the job they had put me on was not a
20    light duty job because they still -- they had me on
21    painkillers like Vicodin, and they still had me doing
22    stuff behind the ticket counter and -- I mean, running
23    around on that stuff.
24         And she -- and so I told her, I said, "Kip, I can't
```

```
 1  be doing all this stuff.  My back's not getting better.

 2  I'm on, you know, pain pills and everything."

 3       And she came out, and she said, "Doreen," she said,

 4  "none of us" -- she goes, "We're not as young as we used

 5  to be."

 6       And I'm like, "Yeah."  And I said, "Well" --

 7       She intimidated me, that woman.  She was -- I don't

 8  know.  I don't know.  No kidding, we're not as young as we

 9  used to be.

10  Q.   And so that conversation was back before you went

11  out on injury-on-duty leave?

12  A.   Yeah.  Yes.  Uh-huh.

13  Q.   What does the reference "threatened Konevich with

14  her job" refer to?

15  A.   Oh, because Chris Konevich was my supervisor at the

16  time, and when they had me on the light duty in the

17  accounting department -- which American says they don't

18  have an accounting department, but it's where we counted

19  all the money and tickets and so on, Chris Konevich came

20  in and told me that --

21       She said, "Doreen, you can't work in this department

22  because Kip said it's not part of an agent duty."

23       And I said, "Well, you know, what -- what do you

24  want me to do?"  I said, "I can't, you know, go out and
```

DUNN & GOUDREAU

```
 1   lift 100-pound bags.  I mean, I'm on" --
 2        So she said, "Listen."  She goes, "This is just --
 3   she's my boss, and if I don't tell you you can't work
 4   here, then she'll get rid of me."
 5   Q.   And is that what precipitated your going out on
 6   injury-on-duty leave?
 7   A.   No.
 8   Q.   What job did you assume after Ms. Konevich
 9   reassigned you from accounting?
10   A.   They had me working behind the ticket counter, but
11   Kip Hamilton said, "You don't have to pick bags up."
12   Q.   Would you like to take a break for a couple of
13   minutes?
14   A.   They had me -- then they made a position with this
15   portable ticket counter -- with this portable ticket
16   counter beside the front door of the entrance coming in
17   from the skycap well.  And it was -- it was put there for
18   me, to answer questions and reissue tickets and run people
19   to security.
20        And that's what they did.  And I had to basically
21   stand there.  I forget how many hours they had me working.
22   And I had to stand there -- which was not a problem, but
23   that's not what it entailed, what they told me.  It just
24   got to be like this incredible job.
```

```
 1  Dr. Sahadeo wrote to AA Medical, if there are such
 2  letters?
 3  A.    No.
 4  Q.    Do you know if Dr. Sahadeo ever wrote any letter
 5  beyond the one that's marked as Exhibit 4 to AA Medical?
 6  A.    No.
 7  Q.    And for the record, what is the date of this letter?
 8  A.    July 25, 2001.
 9  Q.    Do you recall asking Dr. Sahadeo on or about that
10  time to write to AA Medical?
11  A.    No.   I didn't ask him to write the letter.
12  Q.    And why would Dr. Sahadeo be writing to AA unless
13  you had asked him to do so?
14  A.    Because I think the medical department asked them to
15  write the letter.
16  Q.    So is it your understanding that the medical
17  department contacted Dr. Sahadeo, requesting that he give
18  them an update on your medical condition?
19  A.    Yes.
20  Q.    Are you aware of any contacts between Dr. Sahadeo
21  and American Airlines before July of 2001?
22  A.    No.   I don't remember.
23  Q.    Are you aware of whether AA Medical needed a letter
24  of clearance from Dr. Sahadeo before it could determine
```

| 1 | whether you could return to work? |
|---|---|
| 2 | A.    Yes.   They needed a letter of clearance. |
| 3 | Q.    So is it fair to say that AA Medical couldn't have |
| 4 | considered your case until it received this letter from |
| 5 | Dr. Sahadeo in July of 2001? |
| 6 | MR. TEWHEY:  Objection. |
| 7 | Q.    (By Ms. Mariani)  Let me rephrase that. |
| 8 | Is it your understanding that AA Medical would not |
| 9 | clear you to return to work until it had received a |
| 10 | clearance letter from Dr. Sahadeo? |
| 11 | A.    I don't know. |
| 12 | Q.    Is it your understanding that you would not be |
| 13 | returned to work until AA Medical had received letters |
| 14 | from your treating physicians? |
| 15 | A.    I believe so. |
| 16 | Q.    You testified earlier about a conversation with |
| 17 | Andee Vallee regarding your return to work and a |
| 18 | discussion that she had with AA Medical.  And I apologize |
| 19 | if I'm rehashing something that we talked about last time, |
| 20 | but I want to make sure that I'm clear on it. |
| 21 | A.    Mm-hmm. |
| 22 | Q.    Did Ms. Vallee say why Medical was not allowing you |
| 23 | to return to work? |
| 24 | A.    I can't remember if she said, "It's your medicine," |

```
 1    or "I think it's your medicine," but she definitely said
 2    my medicine, but I don't know if she said "I think" or
 3    "is" or -- I don't remember.  I'm sorry.
 4    Q.   Did anyone else at AA ever mention your medicine to
 5    you?
 6    A.   No.  No one.
 7    Q.   Did you ever contact Medical to ask questions about
 8    your medicine after you spoke with Ms. Vallee?
 9    A.   I don't remember.
10    Q.   If you had, would it be reflected in your notes?
11    A.   Probably not.
12    Q.   And why not?
13    A.   Because 9/11 hit shortly after.
14    Q.   Looking at your notes again, the next page of your
15    notes appears to be dated September 5, 2001.  Is that
16    correct?
17    A.   Mm-hmm.
18    Q.   And please correct me if I read this wrong, but I
19    want to make sure we're talking about the same thing here.
20    "September 5, Wednesday, 2001, called Vallee because of no
21    info from med.  She had info from med and said because of
22    medicine, I couldn't perform my job.  Safety, comma,
23    sensitive function, comma."
24         Did I read that correctly?
```

| | |
|---|---|
| 1 | Q.    Do you know by position who held the job of injury |
| 2 | counselor? |
| 3 | A.    I think that they have a whole department in Dallas. |
| 4 | Q.    Do you know whether it's a department that's run by |
| 5 | American or run by the insurer? |
| 6 | A.    By American. |
| 7 | Q.    And how do you know that? |
| 8 | A.    Because it was in the company newspaper. |
| 9 | Q.    Do you remember when it was in the company |
| 10 | newspaper? |
| 11 | A.    Let's see.  It might have been -- no.  I don't |
| 12 | remember. |
| 13 | Q.    Do you remember if it was before your first leave? |
| 14 | A.    No, but I have it at home.  I can find out for you. |
| 15 | Q.    If you could do that, I would appreciate that, and |
| 16 | pass the information along to your attorney. |
| 17 | A.    Sure. |
| 18 | Q.    Were you assigned someone from the insurance company |
| 19 | to work with you with regard to your workers' compensation |
| 20 | claim? |
| 21 | MR. TEWHEY:  Objection. |
| 22 | You can answer. |
| 23 | A.    No.  I don't know who she -- there was somebody, but |
| 24 | I don't know who she worked for. |

DUNN & GOUDREAU

| 1 | Q. | (By Ms. Mariani) When you say there was somebody, |

2    would you describe the somebody to me?

| 3 | A. | The somebody was maybe a nurse or case handler or |

4    something.

| 5 | Q. | Was that somebody at the insurance company? |

| 6 | A. | I don't know. |

| 7 | Q. | What did this person do for you? |

| 8 | A. | Just called to see how I was doing. |

| 9 | Q. | Anyone else communicate with you regarding your |

10   workers' compensation leave?

| 11 | A. | No. |

| 12 | Q. | When you said she would call to see how you were |

13   doing, what kinds of things would she ask you?

| 14 | A. | "How are you feeling? What did your doctor say?" |

15   Things like that.

| 16 | Q. | Was this person in communication with AA Medical? |

| 17 | A. | I don't know. |

| 18 | Q. | Was this person in communication with your |

19   supervisor?

| 20 | A. | I don't know. |

| 21 | Q. | Did you have an understanding as to what her role |

22   was with regard to your workers' compensation benefits?

| 23 | A. | I think she was a nurse, but I don't know who she |

24   worked for.

DUNN & GOUDREAU

1

2

3

4

5    COMMONWEALTH OF MASSACHUSETTS
     SUFFOLK, SS.
6

7

8        I, VIRGINIA DODGE, a Notary Public in and for the
     Commonwealth of Massachusetts, do hereby certify that
9    there came before me on the 20th day of September, 2005,
     at the offices of FITZHUGH, PARKER & ALVARO, LLP,
10   155 Federal Street, Suite 1700, Boston, Massachusetts, the
     following named person, to wit:  DOREEN E. CERRA, who was
11   previously duly sworn to testify to the truth and nothing
     but the truth as to her knowledge touching and concerning
12   the matters in controversy in this cause; that she was
     thereupon examined upon her oath and said examination
13   reduced to writing by me; and that the statement is a true
     record of the testimony given by the witness, to the best
14   of my knowledge and ability.

15

16       I further certify that I am not a relative or
     employee of counsel/attorney for any of the parties, nor a
17   relative or employee of such parties, nor am I financially
     interested in the outcome of the action.
18

19
         WITNESS MY HAND this 4th day of October, 2005.
20

21

22                            Virginia Dodge

23                            Notary Public
                              RPR #835835
24   My Commission Expires:
     November 17, 2011

DUNN & GOUDREAU

**EXHIBIT 3**

**Page 1**

```
 1              UNITES STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2
                         C.A. NO. 04-12095 RGS
 3
      *******************************
 4    DOREEN CERRA,                   )
                 Plaintiff;           )
 5                                    )
           vs.                        )
 6                                    )
      AMERICAN AIRLINES, INC.,        )
 7              Defendant.            )
      *******************************
 8
 9         DEPOSITION OF ANDREA VALLE, a witness
10    called on behalf of the Plaintiff, pursuant
11    to the provisions of Rule 30 of the
12    Massachusetts Rules of Civil Procedure,
13    before Meredith A. Fairbanks, a Notary Public
14    and Shorthand Reporter in and for the
15    Commonwealth of Massachusetts, at the offices
16    of James Tewhey, 19 North Street, Salem,
17    Massachusetts, on Monday, November 7, 2005,
18    commencing at 9:48 a.m.
19
       DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
20                   One State Street
               Boston, Massachusetts 02109
21               Telephone (617) 742-6900
```

**Page 2**

```
 1    APPEARANCES:

 3    James Tewhey
 4      The Law Offices of James Tewhey
        19 North Street
 5      Salem, MA 01970
        (978)741-2255
        for the Defendant.

 6    Amy Cashore Mariani
 7      Fitzhugh, Parker & Alvaro, LLP
        155 Federal Street
 8      Boston, MA 02110
        (617)695-2335
 9      for the Defendant.

10    David W. Strickler
        American Airlines
11      4333 Amon Carter Boulevard
        Forth Worth, TX 76155
12      (817)967-1116
        for the Defendant.
```

**Page 3**

```
 1                  I N D E X
 2    Deposition of:          Direct  Cross
 3    Andrea Valle
 4      By Mr. Tewhey            4
 5      By Ms. Mariani                  65

 9                E X H I B I T S
10    No.                            Page
12    1  July 25, 2001 Letter         17
13    2  Airport Agent Job Description 22
14    3  American Airlines Regulations 46
15    4  May 1, 2002 Letter           53
```

**Page 4**

```
 1                    *  *  *
 2          Andrea Valle, a witness called for
 3    examination by counsel for the Plaintiff,
 4    having been duly sworn, testified as follows:
 5                    *  *  *
 7    DIRECT EXAMINATION
 8  Q. (By Mr. Tewhey)  For the record, could you
 9    please give us your full name?
10  A. Andrea Valle.
11       MS. MARIANI:  Before we get started, I
12    just want to make sure we have the
13    stipulations on the record.
14       MR. TEWHEY:  I was going to do that.
15       THE WITNESS:  It's one "E."  V-A-L-L-E.
16    One E.  V-A-L-L-E.
17       MR. TEWHEY:  Okay.  Thank you.  Do you
18    want to go with the usual stipulations?
19       MS. MARIANI:  Sure.  Reserve objections
20    except as to form until time of trial.
21    Reserve motions to strike.  And the witness
22    has 30 days to read and sign, no notary
23    required.
24       MR. TEWHEY:  That's correct.
```

**Page 5**

1  Q. (By Mr. Tewhey)  Ms. Valle, could you please
2     give me your residential address?
3  A. 11 Alfred Street in Squantum,
4     S-Q-U-A-N-T-U-M, Mass. 02171.
5  Q. And are you currently employed?
6  A. Self employed.
7  Q. Could you tell me what you're self employed
8     as?
9  A. I own a restaurant.
10 Q. And could you tell me what restaurant you
11    own?
12 A. The Wheelhouse Diner.
13 Q. Could you tell me where that is located?
14 A. Quincy, Mass.
15 Q. And how long have you owned the Wheelhouse
16    Diner?
17 A. Two years.
18 Q. Prior to owning the Wheelhouse Diner, could
19    you tell me where you were employed?
20 A. American Airlines.
21 Q. Could you tell me for how long you had been
22    employed by American Airlines?
23 A. Just shy of 35 years.
24 Q. Ms. Valle, are you a high school graduate?

**Page 6**

1  A. Yes.
2  Q. Could you tell me where you graduated from
3     high school?
4  A. Swampscott High School.
5  Q. Could you tell me what year you graduated?
6  A. 1964.
7  Q. And after high school, did you go to college?
8  A. Yes.
9  Q. Could you tell me what college you went to?
10 A. Vermont College.
11 Q. And could you tell me where Vermont College
12    is located?
13 A. Montpelier, Vermont.
14 Q. And did you receive a degree from Vermont
15    College?
16 A. No.
17 Q. Have you received a degree from any college?
18 A. No.
19 Q. Could you tell me how long you went to
20    Vermont College?
21 A. One year.
22 Q. Could you tell me what you're first full-time
23    job was after you left Vermont College?
24 A. Oh, my God.  I worked at a retail store in

**Page 7**

1     Boston called The Gray Shop, which is no
2     longer in existence, and then I became a
3     professional model.
4  Q. Do you recall when you became a professional
5     model?
6  A. 1966.
7  Q. Could you tell me when you first became
8     employed by American Airlines?
9  A. July 1, 1968.
10 Q. And what position were you first employed as
11    at American Airlines?
12 A. Ticket agent airport.
13 Q. And could you tell me what location you were
14    employed at?
15 A. Logan.
16 Q. Have you ever worked at any other airport
17    other than Logan?
18 A. No.
19 Q. For how long were you a ticket agent for
20    American Airlines?
21 A. Oh, my God.  I mean, my whole career,
22    basically.  Because I ended up being an
23    instructor and it's just innately a part of
24    being part of your operation.  So, I mean,

**Page 8**

1     you needed to know those skills.
2  Q. But were there, during your career, during
3     the 35-year career at American Airlines, did
4     you ever hold any other position other than
5     that designated as ticket agent?
6  A. Yes.
7  Q. Could you tell me what positions you've held
8     other than that of a ticket agent?
9  A. I was a ticket lift agent.  I was A.C.C.
10    agent, which is you were responsible for the
11    whole ticket lift and assignment.  I was an
12    instructor.  I was an international departure
13    coordinator, and I was customer service
14    manager.
15 Q. Could you tell me how long you were a ticket
16    lift agent?
17 A. Roughly, approximately, maybe eight to ten
18    years.
19 Q. And the A.C.C. agent?
20 A. I really -- maybe five years.
21 Q. As an A.C.C. agent, were you a manager?
22 A. No.  I was not part of the management team,
23    but you were a manager of the shift where it
24    was your responsibility to make sure that the

9

| | |
|---|---|
| 1 | agents were at the gate to open the gates and |
| 2 | the arrivals were met in a timely manner. |
| 3 | Q. And you also said you were an instructor; is |
| 4 | that correct? |
| 5 | A. Right. |
| 6 | Q. Do you know for how long you were an |
| 7 | instructor? |
| 8 | A. Couple years. Two or three years. |
| 9 | Q. And you also worked for the international |
| 10 | department? |
| 11 | A. Yes. |
| 12 | Q. And what specifically were your |
| 13 | responsibilities there? |
| 14 | A. The I.D.C. was responsible for everything. |
| 15 | For the arrivals, the departures, meeting and |
| 16 | greeting and handling any problems in |
| 17 | customs, the catering. We were responsible |
| 18 | to get everything together. |
| 19 | Q. And were you considered part of management |
| 20 | when you were working for the international |
| 21 | department? |
| 22 | A. Yes. |
| 23 | Q. Could you tell me how many people you |
| 24 | supervised in that position? |

10

| | |
|---|---|
| 1 | A. I directly had seven or eight people that |
| 2 | reported directly to me and I worked with |
| 3 | ramp management and there were another, |
| 4 | anywhere from five to eight guys that would |
| 5 | be attached to that arrival and I was the |
| 6 | liaison with them. |
| 7 | Q. Do you recall what years you were an |
| 8 | instructor? |
| 9 | A. It was in the '80s. Eighty -- let's see. |
| 10 | Paul came, when did Paul come? Maybe from |
| 11 | 1986 on for a couple of years. |
| 12 | Approximately. I can't swear to the dates. |
| 13 | Q. And do you recall when you were in charge of |
| 14 | the international department or when you |
| 15 | worked for the international department? |
| 16 | A. It was in the '90s, but I can't tell you when |
| 17 | specifically. |
| 18 | Q. And you indicated you were a customer service |
| 19 | manager; is that correct? |
| 20 | A. Mm-hmmm. |
| 21 | Q. And is that a management position? |
| 22 | A. Yes, it is. |
| 23 | Q. What were your responsibilities as a customer |
| 24 | service manager? |

11

| | |
|---|---|
| 1 | A. It's easy to tell you what we weren't |
| 2 | responsible for. Everything. I mean, the |
| 3 | operation, coaching and counseling, |
| 4 | attendance, handling irate passengers, making |
| 5 | sure -- just everything. I mean, everything. |
| 6 | Q. And who reported to you as a customer service |
| 7 | manager? |
| 8 | A. I directly had 20 to 30 agents at any time |
| 9 | that were direct reports of mine. |
| 10 | Q. Was -- |
| 11 | Strike that. |
| 12 | Did you ever supervise Doreen Cerra? |
| 13 | A. No. |
| 14 | Q. What was your relationship to Doreen Cerra, |
| 15 | if any? |
| 16 | A. She was a coworker at the time that she was |
| 17 | with American. |
| 18 | Q. Was she a coworker while you were an |
| 19 | instructor? |
| 20 | A. I don't recall. I don't specifically recall. |
| 21 | Q. Do you recall when she was a coworker with |
| 22 | you? |
| 23 | A. I would say in the early '90s. And that's a |
| 24 | guess. |

12

| | |
|---|---|
| 1 | Q. Were you aware that Doreen Cerra had taken a |
| 2 | medical leave of absence at some point in |
| 3 | time? |
| 4 | A. Yes. |
| 5 | Q. And how did you become aware of that? |
| 6 | A. There isn't anything that goes on in an |
| 7 | airport that you don't know, I mean, that you |
| 8 | don't hear wind of. It's just, I knew she |
| 9 | was out on I.D. |
| 10 | Q. Did Doreen Cerra at any time talk to you |
| 11 | while she was out on a leave of absence? |
| 12 | A. No. I had no social relationship with her. |
| 13 | Q. Did she ever call you in your capacity as a |
| 14 | manager at American Airlines while she was |
| 15 | out on leave? |
| 16 | A. In response to a phone call I made, yes. |
| 17 | Q. Do you recall when that was? |
| 18 | A. Either late 2000/early 2001. I know it was |
| 19 | before September 11th. It seems like |
| 20 | everything is pre-September 11th or after. |
| 21 | Q. Okay. Do you recall why you called her? |
| 22 | A. I had been given the task along with another |
| 23 | C.S.M. to handle the attendance issues that |
| 24 | we had. There was another gentleman who |

13

1    worked specifically administrative C.S.M. and
2    handled that and he left American, so I took
3    over the majority of the attendance issues
4    and handling it. And I also was in charge of
5    doing the bids, so our head count was a
6    specific issue also.
7 Q. Why would that have caused you to call Doreen
8    Cerra?
9 A. She was part of our head count. I had two
10   people that were part of our head count that
11   were what you'd consider unutilized heads.
12   And I noticed when I was going through the
13   paperwork that there hadn't been any, she had
14   not corresponded with us for quite a while,
15   so I sent her a letter stating that she
16   needed to update her medical issues.
17 Q. And did, in fact, Doreen Cerra do that?
18 A. It took a while to get in touch with her and
19   I had sent her a letter and then from there
20   it goes to A.A. Medical and then they'll
21   respond to me if there's any questions or
22   answers.
23 Q. You indicated you talked to her by phone; is
24   that correct?

14

1 A. Mm-hmmm.
2 Q. And do you recall what that conversation
3    encompassed?
4 A. Was that she, the first conversation was that
5    I needed her to get that information to A.A.
6    Medical. It was in the same time I was
7    sending the letter, so it's just a
8    verification of, "Did you get the letter?
9    Please make sure you follow through with it."
10 Q. Was there a second conversation with her?
11 A. There were a -- yeah, there was, but I --
12   there were a couple, but I can't give you
13   exact time frame on them.
14 Q. Let's go to the second conversation. Can you
15   tell me --
16   Strike that.
17   Do you recall the second conversation, what
18   the contents of that conversation were?
19 A. The second -- no, I can't tell you
20   specifically what it, no.
21 Q. Could you tell me in general?
22 A. I can tell you in general what the two or
23   three conversations I had with her, but I
24   can't tell you in time order what they were.

15

1 Q. Would you do that for me, please?
2 A. I told -- she called me. She told me that
3    she had sent the paperwork in to A.A.
4    Medical. She discussed coming back to work
5    and I, and my comment to her was, when and if
6    we get the clearance, she would be returning
7    to Boston. And she did not want to return to
8    Boston. She wanted to go to Miami.
9    And I explained to her that that couldn't
10   happen, she had to return to the station that
11   she had been granted the leave from and she
12   got a little upset with it and I said,
13   "There's nothing I can do. You need to talk
14   to Human Resources. The rule is you come
15   back here."
16 Q. Did you have any conversations with anybody
17   at A.A. Medical about Doreen Cerra?
18 A. Conversations about her? No. What happens
19   with her and A.A. Medical is between her and
20   A.A. Medical.
21 Q. During your conversations with Doreen Cerra,
22   did she ever indicate that she was ready to
23   come back to work?
24 A. Possibly. But that's no, no concern to me.

16

1    It's what's A.A. Medical saying.
2 Q. When an individual is out on a leave, could
3    you please describe the process by which they
4    would be allowed to come back to work?
5    MS. MARIANI: Objection. You may answer.
6 A. It would -- could you repeat that?
7    MR. TEWHEY: Yes. Could you read the
8    question back, please.
9    (The stenographer read back the last
10   question.)
11 A. They would have to be cleared by A.A.
12   Medical.
13 Q. (By Mr. Tewhey) Do you know what the process
14   is by which Medical clears an individual to
15   come back to work?
16 A. No.
17    MS. MARIANI: Objection. You may answer.
18    THE WITNESS: Sorry.
19 Q. (By Mr. Tewhey) Do you know if there are
20   different policies at American Airlines for
21   an individual who is out on a medical leave
22   because they were injured on the job?
23    MS. MARIANI: Objection.
24 A. No.

17

```
1    Q.  (By Mr. Tewhey)  No, you don't?  You're not
2        aware of different policies?
3            MS. MARIANI:  Objection.
4    A.  True, I am not aware.
5    Q.  (By Mr. Tewhey)  You had indicated earlier
6        that you did not directly supervise Doreen
7        Cerra; is that correct?
8    A.  No, I didn't.
9    Q.  Okay.  Why was it that you were calling then
10       on the head count issue?
11   A.  I explained.  I was in charge of attendance.
12   Q.  And Ms. Cerra, as I understand it, at the
13       time you were calling, was out on medical
14       leave; is that correct?
15   A.  It was my understanding that she was.
16   Q.  How did you come to that understanding?
17   A.  It was coded so in the computer.
18           MR. TEWHEY:  Mark this as Exhibit 1.
19           (The stenographer marked the document
20       Exhibit No. 1 for identification.)
21   Q.  (By Mr. Tewhey)  I'm going to show you what
22       was marked as Exhibit No. 1 for the purposes
23       of this deposition.  Could you take a look at
24       that, please?
```

18

```
1    A.  Mm-hmmm.
2    Q.  Have you ever seen that letter before?
3    A.  No.
4    Q.  Did anyone at American Airlines Medical ever
5        contact you and indicate to you that Doreen
6        Cerra was not cleared to come back to work?
7            MS. MARIANI:  Objection.  You may answer.
8    A.  Yes.
9    Q.  (By Mr. Tewhey)  And could I ask who that
10       was?
11   A.  Dr. Yiannou.
12   Q.  And did he indicate to you why she was not
13       cleared to return to work?
14   A.  No.
15   Q.  Did he ever reduce --
16           Strike that.
17       Did you ever get anything in writing from
18       American Medical indicating that Doreen Cerra
19       was not capable of returning to work?
20   A.  Yes.
21   Q.  And who sent that letter?
22   A.  Dr. Yiannou.
23   Q.  Do you recall the date of that letter?
24   A.  No.
```

19

```
1            MR. TEWHEY:  Can we go off the record for
2        a second.
3            (There is a discussion off the record.)
4    Q.  (By Mr. Tewhey)  You indicated that was a
5        letter.  Is it possible that it was a form?
6    A.  Mm-hmmm.  Yes.
7    Q.  Do you recall what the form would have looked
8        like?
9    A.  It was a yellow sheet of paper and there
10       were, it was almost like an ordering form and
11       it would say "cleared," "not cleared,"
12       "restrictions," whatever.
13   Q.  Do you recall whether this particular form
14       was checked off that she was simply not
15       cleared to return to work or did it indicate
16       that there were restrictions?
17           MS. MARIANI:  Objection.  You may answer.
18   A.  Not cleared.
19   Q.  (By Mr. Tewhey)  At the point you received
20       the letter or form indicating that Doreen
21       Cerra was not cleared to return to work, did
22       you so inform Ms. Cerra?
23           MS. MARIANI:  Objection.  You may answer.
24   A.  No.  It was not my responsibility.
```

20

```
1    Q.  (By Mr. Tewhey)  And would that have been the
2        responsibility of the medical department?
3            MS. MARIANI:  Objection.
4    A.  Yes.
5    Q.  (By Mr. Tewhey)  Did you have any other
6        contact with Doreen Cerra after you received
7        that form?
8    A.  Possibly one of those phone conversations may
9        have occurred afterwards.
10   Q.  And do you recall whether you told her that
11       she was not cleared to return to work?
12   A.  I don't recall specifically.
13   Q.  Do you recall whether you received any other
14       communication from American Medical regarding
15       Doreen Cerra?
16   A.  No.
17   Q.  No, you don't recall?
18   A.  No, I don't recall.  Just what I've told you
19       before.
20   Q.  Was there a personnel file for Doreen Cerra
21       kept at Logan Airport?
22   A.  No.
23   Q.  Did you keep a file on Doreen Cerra while you
24       were there?
```