```
                                      21
 1   A.  With my correspondence, yes.  Copies of the
 2       letters that I may have sent her.
 3   Q.  Where would you have kept that file?
 4   A.  In my locked desk.
 5   Q.  When you left American Airlines, did you turn
 6       that file over to anyone?
 7   A.  Yes.
 8   Q.  Who did you turn it over to?
 9   A.  H.R.
10   Q.  And was H.R. located at Logan Airport?
11   A.  Yes.
12   Q.  Did you turn it over to anyone specifically
13       at H.R.?
14   A.  Sharon Douglas.
15   Q.  Did you turn it over to her personally or did
16       you send it by inter-office mail?
17       MS. MARIANI:  Objection.  You may answer.
18   A.  I handed it to her.
19   Q.  (By Mr. Tewhey)  Do you recall the date that
20       you handed it to her?
21   A.  No.
22   Q.  Do you recall the date that you left American
23       Airlines?
24   A.  It was December of 2002.
```

```
                                      22
 1   Q.  Do you know how --
 2       Strike that.
 3       Presumably, then, you would have turned that
 4       file over to Ms. Douglas before December of
 5       2002; is that correct?
 6   A.  It would, it was before I left.  I'm not sure
 7       exactly what day in that month that I left,
 8       but any paperwork that I had on any issue was
 9       turned over to the appropriate parties before
10       I left my last day.
11       MR. TEWHEY:  Mark that as Exhibit 2.
12       (The stenographer marked the document
13       Exhibit No. 2 for identification.)
14   Q.  (By Mr. Tewhey)  I'm going to show you what's
15       been marked as Exhibit 2 for the purposes of
16       this deposition.  Could you take a moment to
17       review that, please?
18   A.  Mm-hmmm.
19   Q.  Are you familiar with this document?
20   A.  Intimately.
21   Q.  Could you tell me what this document is?
22   A.  Just, basically, a description of everything
23       that we do at the airport.
24   Q.  And it's a description of, it's a job
```

```
                                      23
 1       description; is that correct?
 2   A.  True.
 3   Q.  And for what position?
 4   A.  Airport agent.
 5   Q.  Do you have any idea what date this document
 6       was put together?
 7   A.  No.
 8   Q.  If you could go to Page 2 of this document?
 9   A.  Mm-hmmm.
10   Q.  There's a section that's delineated "Job
11       Requirements"; is that correct?
12   A.  I'm sorry, I don't see where you're at.  Job
13       requirements, okay.  Mm-hmmm.
14   Q.  And that lists various requirements for the
15       job; is that correct?
16   A.  Yes.
17   Q.  One of the requirements about mid way through
18       the paragraph reads, "Meet height, weight,
19       and profile requirements"; is that correct?
20   A.  Yes.
21   Q.  Could you tell me what that means?
22   A.  No.  It would, it says, "Refer to passenger
23       service manual."
24   Q.  At the time you were originally hired as an
```

```
                                      24
 1       agent?
 2   A.  Mm-hmmm.
 3   Q.  For American Airlines, did American Airlines
 4       have specific height and weight requirements
 5       for ticket agents?
 6       MS. MARIANI:  Objection.  You may answer.
 7   A.  Yes.
 8   Q.  (By Mr. Tewhey)  Could you tell me what those
 9       were?
10       MS. MARIANI:  Objection.  You may answer.
11   A.  Proportionate, it was just proportionate,
12       your overall appearance.  I mean, it was more
13       your appearance and how you would portray
14       yourself professionally in front of the
15       customers and the public.
16   Q.  (By Mr. Tewhey)  Did American Airlines ever
17       do away with the height, weight, and profile
18       requirements, that you're aware of?
19       MS. MARIANI:  Objection.  You may answer.
20   A.  It is my understanding they did.
21   Q.  (By Mr. Tewhey)  Do you recall when they did?
22   A.  No.
23   Q.  Do you recall if they did away with these
24       requirements prior to 2000?
```

**25**

1     MS. MARIANI: Objection. You may answer.
2   A. Yes.
3   Q. (By Mr. Tewhey) Do you recall whether they
4     did them prior to the mid 1980s?
5     MS. MARIANI: Objection. You may answer.
6   A. Don't recall.
7   Q. (By Mr. Tewhey) Do you recall whether they
8     did away with these particular requirements
9     prior to 1990?
10    MS. MARIANI: Objection. You may answer.
11  A. I don't recall.
12  Q. (By Mr. Tewhey) But, at some point in time,
13    they did away with those requirements?
14    MS. MARIANI: Objection. You may answer.
15  A. Yes.
16  Q. (By Mr. Tewhey) Would it be fair to say then
17    that at least this part of this description
18    for the airport agents is inaccurate?
19    MS. MARIANI: Objection. You may answer.
20  A. Could you repeat that question, please?
21    (The stenographer read back the last
22    question.)
23  A. Yeah, no. I mean, it's not, it's not
24    something that's clearly defined.

**26**

1   Q. (By Mr. Tewhey) Well, you testified earlier
2     that height, weight, and profile requirements
3     were done away with at some point in time at
4     American Airlines for ticket agents?
5   A. Profile requirements, i.e., are you clean,
6     neat, and represent yourself well, still are
7     maintained in just about every job function.
8   Q. But the requirement to meet height/weight
9     requirements, those have been done away with?
10    MS. MARIANI: Objection. You may answer.
11  A. It's my understanding, yes. Because of the
12    Americans with Disabilities Act.
13  Q. (Mr. Tewhey) All I'm asking, ma'am, is at
14    least relative to those two issues, meet
15    height/weight requirements, this job
16    description would not be accurate as it was
17    written?
18    MS. MARIANI: Objection. You may answer.
19  A. It's not my, it's not in my realm to make
20    that decision.
21  Q. (By Mr. Tewhey) Okay. In reading through
22    this, are you aware of any other requirements
23    that are in this job description that were
24    not valid requirements as of 2000?

**27**

1     MS. MARIANI: Objection. You may answer.
2   A. No.
3   Q. (By Mr. Tewhey) Were there various jobs at
4     Logan Airport for which an airport agent
5     would be eligible for?
6   A. Could you rephrase that?
7   Q. I'll try. Let me rephrase it. Let me strike
8     that question and ask it another way. The
9     airport agents, where might they be assigned
10    on any given day?
11  A. Anyplace.
12  Q. And when you say anyplace, could you
13    delineate where anyplace might be?
14  A. Ticket lift, ticket counter, baggage service.
15    Wherever the need was.
16  Q. Well, you said ticket lift, ticket counter?
17  A. Mm-hmmm.
18  Q. Is that one position or two?
19  A. No, two separate areas.
20  Q. Okay. You've indicate the baggage service.
21    Is there any other?
22  A. No, not really. No.
23  Q. Could you please describe what a ticket lift
24    job would be?

**28**

1   A. Ticket lift is departures, working the gates.
2   Q. When you say working the gates, could you
3     please be more specific in terms of what you
4     mean?
5   A. You worked the departure. You opened up the
6     gate an hour before departure time, processed
7     the passengers, boarded the people, conferred
8     with the crew, made sure that all security
9     items had been checked off, closed up the
10    flight, retracted the jet bridge, waved
11    goodbye to the captain.
12  Q. Could you describe what a ticket, I think one
13    of the descriptions you used was a ticket
14    agent?
15  A. Mm-hmmm. Ticket counter.
16  Q. What were the responsibilities of that
17    individual?
18  A. To meet and to greet the passengers, check
19    them in, do any ticketing that they may need,
20    check their baggage, make sure that they
21    weren't carrying any hazardous materials.
22    That was the first line of communication was
23    with the ticket agent at the counter.
24  Q. When an individual first came into the

**ANDREA VALLE**

---

**29**

```
 1        airport and was getting ready to board the
 2        flight, would the first stop be at the ticket
 3        counter?
 4             MS. MARIANI:  Objection.
 5   A.   Possibly.
 6   Q.   (By Mr. Tewhey)  And that's where they would
 7        go through this particular set of
 8        responsibilities that you just described; is
 9        that correct?
10   A.   Mm-hmmm.
11   Q.   You had said that possibly that would be
12        where they would go.  Is there someplace else
13        that they might go?
14   A.   Sky cap.
15   Q.   Were the ticket agents eligible to be a sky
16        cap?
17   A.   No.
18   Q.   Why not?
19   A.   It was a different, it was out of
20        classification.
21   Q.   Were there other jobs other than being a
22        ticket agent within the ticket agent's job
23        classification?
24             MS. MARIANI:  Objection.  You may answer.
```

**30**

```
 1   A.   No.
 2   Q.   (By Mr. Tewhey)  So the ticket agent was
 3        simply one classification?
 4             MS. MARIANI:  Objection.
 5   A.   No.  The airport agent was one
 6        classification.
 7   Q.   (By Mr. Tewhey)  And did airport agent
 8        encompass the job of ticket agent?
 9   A.   Yes.
10   Q.   Were there other jobs that an airport agent
11        could also perform?
12   A.   Other?  No.  You were an airport agent,
13        period.
14   Q.   And did an airport agent's job encompass
15        solely dealing with customers and ticketing
16        responsibility and baggage responsibility?
17             MS. MARIANI:  Objection.  You may answer.
18   A.   Yes.
19   Q.   (By Mr. Tewhey)  You had mentioned earlier in
20        your deposition something about bidding?
21   A.   Mm-hmmm.
22   Q.   Could you tell me what that process involved?
23   A.   A lot of Excedrin.  You had a work force, a
24        head count, that you were given by
```

**31**

```
 1        headquarters and in that head count you had
 2        to divide your manning so you would have the
 3        ticket counter properly covered and ticket
 4        lift properly covered and baggage service
 5        until they outsourced it.  But, specifically,
 6        at the end of my career, it was ticket
 7        counter, ticket lift.
 8   Q.   Did individuals bid on which of those two
 9        jobs they wanted?
10   A.   There was one bid that would go out covering
11        all of those positions and you, as an agent,
12        bid it according to your seniority.
13   Q.   When did that bid go out?
14             MS. MARIANI:  Objection.
15   A.   Three times a year, four times a year,
16        depending on necessity.
17   Q.   (By Mr. Tewhey)  So as I understand it, a
18        ticket agent, for the sake of this
19        discussion, might, on January 1st, fill out a
20        bid on which job he or she might want; is
21        that correct?
22   A.   True.
23   Q.   And assuming that they got the job, say, at
24        the ticket counter?
```

**32**

```
 1   A.   Mm-hmmm.
 2   Q.   How long would they be able to stay there?
 3             MS. MARIANI:  Objection.
 4   A.   Until the duration of the bid, if they chose
 5        to.
 6   Q.   (By Mr. Tewhey)  And the bid might last?
 7   A.   Three, four months.
 8   Q.   At the end of that three- or four-month
 9        period, a second bid might go out?
10   A.   Mm-hmmm.
11   Q.   Would the individual who had been assigned to
12        the ticket counter be barred from bidding
13        that same job again?
14             MS. MARIANI:  Objection.  You may answer.
15   A.   No.  They were not assigned.  They chose to
16        work there.
17   Q.   (By Mr. Tewhey)  What I'm asking, though, is,
18        would an individual who had been assigned to
19        the ticket counter for, let's say, January to
20        March, new bid comes out, can that person
21        still seek an assignment as a ticket counter
22        based on their seniority?
23             MS. MARIANI:  Objection.  You may answer.
24   A.   Yes.
```

```
                                        33
1    Q.  (By Mr. Tewhey)  Could an individual stay,
2         assuming that their seniority would allow,
3         stay working at the ticket counter
4         indefinitely?
5             MS. MARIANI:  Objection.
6    A.  Yes.
7    Q.  (By Mr. Tewhey)  Was an individual who was
8         working at the ticket counter ever required
9         to operate a jet bridge?
10            MS. MARIANI:  Objection.  You may answer.
11   A.  If they were trained to do so, yes.
12   Q.  (By Mr. Tewhey)  Let me rephrase it.  If
13        they're assigned as a ticket counter, and as
14        I understand it, that's the individual who
15        first greets the passenger, may be the
16        first individual who greets the passenger
17        when they come in; is that correct?
18   A.  Mm-hmmm.
19   Q.  Is that individual going to be required to
20        operate that jet bridge?
21            MS. MARIANI:  Objection.
22   A.  If operationally necessary, yes.
23   Q.  (By Mr. Tewhey)  And how would that come
24        about?
```

```
                                        34
1             MS. MARIANI:  Objection.  You may answer.
2    A.  Off-schedule operation.
3    Q.  (By Mr. Tewhey)  I'm sorry?
4    A.  Off-schedule operation.  We have a weather
5         day, an emergency, whatever.
6    Q.  Were all airport agents trained to operate
7         the jet bridge?
8             MS. MARIANI:  Objection.  You may answer.
9    A.  No.
10   Q.  (By Mr. Tewhey)  How did an individual become
11        trained to operate the jet bridge?
12            MS. MARIANI:  Objection.  You may answer.
13   A.  If they bid ticket lift, they had to go
14        through a specific training.
15   Q.  (By Mr. Tewhey)  The issue that I'm talking
16        about now in terms of training, did that
17        change at any time from 1985 to 2000?
18            MS. MARIANI:  Objection.  You may answer.
19   A.  I have no idea.
20   Q.  (By Mr. Tewhey)  Now, a ticket agent could
21        also work in baggage service; is that
22        correct?
23            MS. MARIANI:  Objection.  You may answer.
24   A.  Prior to the time we outsourced baggage
```

```
                                        35
1         service?
2    Q.  (By Mr. Tewhey)  Yes.
3    A.  Yes.
4    Q.  Could you tell me when you outsourced baggage
5         service?
6    A.  In the '90s sometime.
7    Q.  So after this was essentially done away with,
8         after baggage service was outsourced, that
9         position was no longer available?
10   A.  True.
11   Q.  So the only two positions would be ticket
12        lift and ticket counter; is that correct?
13   A.  True.
14   Q.  I want to go back to the issue of an
15        individual who was working at the ticket
16        counter?
17   A.  Mm-hmmm.
18   Q.  You've indicated that that person might be
19        required to operate a jet bridge; is that
20        correct?
21   A.  Possibly.
22   Q.  And you've indicated that one of the reasons
23        might be weather related; is that correct?
24   A.  True.
```

```
                                        36
1    Q.  Could you describe to me how that might come
2         about?
3             MS. MARIANI:  Objection.  You may answer.
4    A.  There were some agents who would bid ticket
5         lift, bid ticket counter, bid ticket lift,
6         bid ticket, depending on what days off they
7         wanted to hold.  If I had a trained ticket
8         lift agent working the ticket counter and I
9         needed to up my manning in ticket lift, I may
10        take one of those agents and reassign them to
11        ticket lift to fill a job requirement.  But I
12        could only take somebody who had been cleared
13        to do jet bridges because of safety factors.
14   Q.  (By Mr. Tewhey)  So if somebody wasn't
15        cleared --
16   A.  I had no, could not.
17   Q.  You couldn't do that with them?
18   A.  No.
19   Q.  Okay.  The fact that, would --
20            Strike that.
21        As I've understood the testimony, there are
22        some ticket agents who are not cleared to
23        operate the jet bridge; is that correct?
24            MS. MARIANI:  Objection.  You may answer.
```

37

1   A.  Could you repeat that question?  I'm sorry.
2       (The stenographer read back the last
3       question.)
4   A.  No.
5   Q.  (By Mr. Tewhey)  So all ticket agents were
6       trained to operate the jet bridge?
7       MS. MARIANI:  Objection.
8   A.  No.
9   Q.  (By Mr. Tewhey)  I'm not sure I understand
10      that?
11  A.  You said cleared.  It has nothing to do with
12      cleared.  If you bid ticket counter and you
13      bid ticket lift back and forth, which some
14      agents do because they like the variety or
15      the days off, those agents are cleared.  But
16      there are some agents who truly like the
17      ticket counter and choose to bid there all
18      the time.  There is no need to train them to
19      be cleared for the jet bridges.
20  Q.  And those individuals, therefore, might not,
21      at least as I've understood the testimony,
22      could not operate the jet bridge because they
23      hadn't been trained; is that correct?
24      MS. MARIANI:  Objection.  You may answer.

38

1   A.  True.
2   Q.  (By Mr. Tewhey)  An individual who was not
3       trained to operate the jet bridge, could that
4       individual bid for a ticket lift position?
5       MS. MARIANI:  Objection.  You may answer.
6   A.  No.
7   Q.  (By Mr. Tewhey)  So that individual would be
8       limited to working strictly on the ticket
9       counter; is that correct?
10      MS. MARIANI:  Objection.  You may answer.
11  A.  No.
12  Q.  (By Mr. Tewhey)  Could you tell me what else
13      they would be eligible to work at, what other
14      position they would be eligible to work at?
15      MS. MARIANI:  Objection.  You may answer.
16  A.  It goes back to what I testified before.  If
17      you choose to bid the ticket counter, you're
18      trained for ticket counter.  If you choose to
19      work ticket lift, you're trained for ticket
20      lift.  That's a matter of choice by the agent
21      rather than requirement by the company.
22  Q.  (By Mr. Tewhey)  I understand that.  Let me
23      try rephrasing the question then, and I'm
24      going to try to put it in a time frame.  If

39

1       we're talking the years 1990, early 2000, if
2       an individual had not been trained to operate
3       the jet bridge, were they then limited to the
4       ticket counter position?
5       MS. MARIANI:  Objection.  You may answer.
6   A.  Yes.
7   Q.  (By Mr. Tewhey)  And that individual, unless
8       they received training, could not then bid
9       for a ticket lift position; is that correct?
10      MS. MARIANI:  Objection.  You may answer.
11  A.  No.
12  Q.  (By Mr. Tewhey)  No, they could not bid; is
13      that correct?
14      MS. MARIANI:  Objection.
15  Q.  (By Mr. Tewhey)  I'm trying to understand
16      what you just answered "no" to.
17  A.  Could you repeat his question?
18  Q.  Let me try rephrasing it.
19  A.  Okay.
20  Q.  If a --
21      Strike that.
22      On the ticket lift position, could you only
23      work that position if you were trained to
24      operate a jet bridge?

40

1       MS. MARIANI:  Objection.  You may answer.
2   A.  True.
3   Q.  (By Mr. Tewhey)  Would it have been possible
4       for Doreen Cerra, if she had returned to work
5       in 2000, to be assigned solely to the
6       position, to the ticket counter position?
7       MS. MARIANI:  Objection.  You may answer.
8   A.  She wouldn't have been assigned.  She would
9       have bid.
10  Q.  (By Mr. Tewhey)  Would it have been possible
11      for her to bid to that position exclusively?
12      MS. MARIANI:  Objection.  You may answer.
13  A.  Based on her seniority, possibly.
14  Q.  (By Mr. Tewhey)  Were you aware of any ticket
15      agents who, as a result of an injury during
16      the period 1990 to 2001, who had been trained
17      to operate a jet bridge, but could no longer
18      operate it?
19      MS. MARIANI:  Objection.  You may answer.
20  A.  Not for long durations.
21  Q.  (By Mr. Tewhey)  That would indicate that
22      there were some individuals who, for at least
23      a short period of time, were not able to
24      operate a jet bridge; is that correct?

**41**

```
 1        MS. MARIANI:  Objection.  You may answer.
 2   A. If somebody was out on an injury on duty.
 3   Q. (By Mr. Tewhey)  And then came back?
 4   A. And then came back, they would have to be
 5      retrained.
 6   Q. How often would an individual --
 7        Strike that.
 8        Was there a specific time frame within which
 9        individuals had to be retrained on the
10        operation of a jet bridge?
11   A. Yes.
12   Q. And how often did that occur?
13   A. Yearly.
14   Q. Do you recall the process by which an
15      individual was retrained?
16        MS. MARIANI:  Objection.  You may answer.
17   A. You had -- yes.  Yeah.
18   Q. (By Mr. Tewhey)  Could you please describe
19      that process?
20        MS. MARIANI:  Objection.  You may answer.
21   A. You had S.A.I. lessons, which were
22      computerized lessons that you had to do, and
23      you physically were taken through mating the
24      jet bridge with the aircraft and opening all
```

**42**

```
 1      doors.
 2   Q. (By Mr. Tewhey)  Do you recall how long the
 3      training took?
 4        MS. MARIANI:  Objection.  You may answer.
 5   A. In total?  Maybe five to six hours.
 6   Q. (By Mr. Tewhey)  If an individual was out on
 7      a medical leave for an extended period of
 8      time, say over a year, that individual came
 9      back to work?
10   A. Mm-hmmm.
11   Q. In order for that individual to operate the
12      jet bridge, that individual would have to be
13      retrained; is that correct?
14        MS. MARIANI:  Objection.  You may answer.
15   A. Yes.
16   Q. (By Mr. Tewhey)  If that individual was not
17      retrained, I presume that they would not be
18      allowed to operate the jet lift; is that
19      correct?
20        MS. MARIANI:  Objection.  You may answer.
21   A. True.
22   Q. (By Mr. Tewhey)  Would their inability to
23      operate the jet lift be a bar for them
24      returning as a ticket agent?
```

**43**

```
 1        MS. MARIANI:  Objection.  You may answer.
 2   A. It's kind of ambiguous.  The question is
 3      ambiguous.  That's, it's their choice to bid
 4      ticket lift.  If you choose to bid ticket
 5      lift, then you must go through the training
 6      and pass the training.
 7   Q. (By Mr. Tewhey)  And if you choose not to
 8      bid?
 9   A. It's your choice.
10   Q. Then you don't have to go through the
11      training; is that correct?
12        MS. MARIANI:  Objection.
13   A. True.
14   Q. (By Mr. Tewhey)  And the answer to that was
15      "true?"
16        MS. MARIANI:  Objection.
17   A. True.
18   Q. (By Mr. Tewhey)  Were there a specific number
19      of individuals during the period 1990 to
20      early 2001 who were assigned for any given
21      flight to the ticket lift position?
22        MS. MARIANI:  Objection.  You may answer.
23   A. That question doesn't make sense to me.
24   Q. (By Mr. Tewhey)  Okay.  There were specific
```

**44**

```
 1      flights that would be taking off from Logan
 2      at any given time by American Airline
 3      aircraft; is that correct?
 4   A. True.
 5   Q. And at the ticket lift position, would there
 6      always be someone at that position for any
 7      flight that took off from Logan Airport?
 8        MS. MARIANI:  Objection.  You may answer.
 9   A. Yes.
10   Q. (By Mr. Tewhey)  How many people would be
11      assigned to that position per flight?
12        MS. MARIANI:  Objection.  You may answer.
13   A. Depends.
14   Q. (By Mr. Tewhey)  And what would it depend on?
15        MS. MARIANI:  Objection.  You may answer.
16   A. Load factor.
17   Q. (By Mr. Tewhey)  And could you please tell me
18      what you mean by "load factor?"
19   A. A hundred percent capacity, fifty percent
20      capacity.  The capacity of what the aircraft
21      holds.
22   Q. What is the minimum number of people who
23      would be assigned to the ticket lift position
24      for any given flight?
```

**45**

1  A. One.
2  Q. What would be the maximum amount?
3       MS. MARIANI: Objection. You may answer.
4  A. Four.
5  Q. (By Mr. Tewhey) Was there a specific work
6     schedule assigned to each airport agent
7     position?
8       MS. MARIANI: Objection. You may answer.
9  A. If you mean shift work, yes, there was.
10 Q. (By Mr. Tewhey) And could you please
11    describe what a normal shift would be?
12    Hours-wise, I mean.
13      MS. MARIANI: Objection. You may answer.
14 A. Depends on the operation. Depends on when
15    our first departure is and when our last
16    arrival is. That's why we'd have bids.
17 Q. (By Mr. Tewhey) And as I understand it, the
18    bids were assigned, was it strictly by -- I'm
19    drawing a blank -- seniority?
20      MS. MARIANI: Objection. You may answer.
21 A. Absolutely.
22 Q. (By Mr. Tewhey) If an individual was out on
23    a medical leave, did they continue to accrue
24    seniority?

**46**

1       MS. MARIANI: Objection. You may answer.
2  A. It is my understanding, yes.
3       MR. TEWHEY: Could you mark that as
4     Exhibit 3.
5       (The stenographer marked the document
6     Exhibit No. 3 for identification.)
7  Q. (By Mr. Tewhey) I'm going to show you what
8     has been marked as Exhibit 3 for the purposes
9     of this deposition. Could you please review
10    it for a moment?
11 A. Mm-hmmm.
12 Q. Have you seen this document before?
13 A. A long time ago.
14 Q. And do you recall --
15      Strike that.
16    Is this part of a particular set of documents
17    that's made available to supervisors, if you
18    know?
19 A. This is from 1993. This, all of these
20    regulations were available to any employee of
21    American Airlines.
22 Q. Were they available to supervisors?
23 A. Positively.
24 Q. And managers?

**47**

1  A. Positively.
2  Q. If you go to the bottom of this document, it
3     indicates disabled employee applicants; is
4     that correct?
5  A. Yes.
6  Q. It reads, "If the corporate medical staff
7     determines that an employee or applicant is
8     permanently unable to perform the essential
9     functions of his/her job, the company will
10    endeavor to locate an alternate position that
11    he/she can perform and that accommodates
12    his/her disability (Subject to the provisions
13    of the collective bargaining agreement where
14    applicable)." Have I read that correctly?
15 A. Yes.
16 Q. Were the ticket agents part of a union?
17 A. No.
18 Q. Do you know if, in the case of Doreen Cerra,
19    anyone attempted to locate an alternative
20    position that she would have been eligible
21    for?
22      MS. MARIANI: Objection. You may answer.
23 A. No, I do not know.
24 Q. (By Mr. Tewhey) Did you?

**48**

1  A. No. Because she was never cleared to come
2     back to work.
3  Q. And you're not aware of why she was unable to
4     return to work; is that correct?
5  A. Specifically? No.
6  Q. Do you have any idea?
7  A. I was told it was her medications.
8  Q. And who told you it was the medications?
9  A. A.A. Medical.
10 Q. I'm sorry?
11 A. A.A. Medical.
12 Q. Thank you. Do you recall who in A.A. Medical
13    told you?
14 A. Betty.
15 Q. Do you know Betty's last name?
16 A. It was weird. I'm sorry. I always had a
17    problem finding it. Not off-hand I can't
18    remember.
19 Q. Do you know if --
20      Strike that.
21    Were you informed by Betty that the
22    medications that Ms. Cerra was required to
23    take precluded her from operating the jet
24    bridge?

49

1     MS. MARIANI:  Objection.  You may answer.
2  A.  No, I do not.
3  Q.  (By Mr. Tewhey)  Do you recall if Betty
4     stated that the medications that Ms. Cerra
5     was taking precluded her from being a ticket
6     agent?
7     MS. MARIANI:  Objection.  You may answer.
8  Q.  (By Mr. Tewhey)  Excuse me --
9     Strike that.
10    Do you recall if Betty informed you that the
11    medications that Ms. Cerra was taking
12    precluded her from being an airport agent?
13    MS. MARIANI:  Objection.  You may answer.
14 A.  Nothing was ever said to me about that.
15 Q.  (By Mr. Tewhey)  The document that's been
16    marked as Exhibit 3 indicates that somehow
17    American Airlines will endeavor to locate an
18    alternative position that an individual can
19    perform if they're medically unable to
20    perform the position that they're in; is that
21    correct?
22    MS. MARIANI:  Objection.  You may answer.
23 A.  According to this statement, yes.
24 Q.  (By Mr. Tewhey)  Do you know how that process

50

1     would have been instituted?
2     MS. MARIANI:  Objection.  You may answer.
3  A.  It would be referred to Human Resources or,
4     at that time, Personnel.
5  Q.  (By Mr. Tewhey)  Do you know who would have
6     referred it to Human Resources?
7     MS. MARIANI:  Objection.  You may answer.
8  A.  I would hazard a guess that it was probably
9     A.A. Medical.  Because we weren't, we weren't
10    the ones that would do it.
11 Q.  (By Mr. Tewhey)  So your understanding is
12    that, if this kind of a situation arose, it
13    was A.A. Medical's responsibility to make
14    some inquiries as to whether there are other
15    positions available for that employee?
16    MS. MARIANI:  Objection.  You may answer.
17 A.  No.
18 Q.  (By Mr. Tewhey)  Could you tell me then what
19    your understanding is?
20    MS. MARIANI:  Objection.  You may answer.
21 A.  If I got a statement from A.A. Medical that
22    somebody was not cleared to work, I would
23    pass that information on to Human Resources.
24    Any time A.A. Medical had any information

51

1     regarding an employee, it would send, you'd
2     have everybody communicating with one
3     division, which would be Human Resources;
4     i.e., either in New York, Dallas or, if you
5     had a local H.R. rep, that local H.R. rep.
6  Q.  (By Mr. Tewhey)  And did Logan have a local
7     H.R. rep?
8     MS. MARIANI:  Objection.  You may answer.
9  A.  We did.  Then we lost them and then they came
10    back sometime in the '90s.
11 Q.  (By Mr. Tewhey)  Do you know if Logan had an
12    H.R., a local H.R. rep in late '90s and early
13    2000?
14 A.  Yes.
15 Q.  And who was that individual?
16 A.  Sharon Douglas.  She was a field rep who was
17    in Boston.
18 Q.  When you say field rep, do you mean a field
19    rep in the Human Resources Department?
20 A.  Yes.  She would cover other stations besides
21    just Boston.
22 Q.  Do you know what other stations she would
23    cover?
24 A.  No.

52

1     THE WITNESS:  Would you mind if I went to
2     the ladies room?
3     (A break was taken from 10:54 a.m. to
4     10:58.)
5  Q.  (By Mr. Tewhey)  Did American Airlines have a
6     policy that was known as either transitional
7     duty or restricted duty?
8     MS. MARIANI:  Objection.  You may answer.
9  A.  Yes.
10 Q.  (By Mr. Tewhey)  Could you please tell me
11    what your understanding of those two terms
12    were?
13    MS. MARIANI:  Objection.  You may answer.
14 A.  If you were, if an employee was out sick or
15    injured, I mean, there had been a car
16    accident, operation, or whatever, you were
17    cleared by A.A. Medical at some times to come
18    back on transitional duty where, meaning, you
19    were almost okay to go back to full duty, but
20    you had a certain time limit, and if I'm not
21    mistaken, it was 45 days, and then you had to
22    be cleared back to full duty.  It was not for
23    a lengthy period of time.
24 Q.  (By Mr. Tewhey)  If at the end of the period

| | 53 |
|---|---|
| 1 | of time when either transitional or |
| 2 | restricted duty was in place, if an employee |
| 3 | was still not able to come back, were they |
| 4 | then required to go out on a medical leave? |
| 5 | MS. MARIANI: Objection. You may answer. |
| 6 | A. In some cases, yes. |
| 7 | MR. TEWHEY: Mark this as Exhibit 4, |
| 8 | please. |
| 9 | (The stenographer marked the document |
| 10 | Exhibit No. 4 for identification.) |
| 11 | Q. (By Mr. Tewhey) I'll show you what has been |
| 12 | marked as Exhibit 4 for the purposes of this |
| 13 | deposition. Could you please review that? |
| 14 | A. Okay. |
| 15 | Q. Have you seen that document before? |
| 16 | A. No. |
| 17 | Q. Did you review any documents prior to coming |
| 18 | to this deposition? |
| 19 | A. Did I review any documents? |
| 20 | Q. Yes. |
| 21 | A. Like, I don't understand what you're saying. |
| 22 | Q. Prior to coming to this deposition, were |
| 23 | there any documents that you viewed in |
| 24 | preparation for this deposition? |

| | 54 |
|---|---|
| 1 | A. There was a letter that I had sent Doreen |
| 2 | that I forwarded off a copy, you know, the |
| 3 | master. |
| 4 | Q. Yes? |
| 5 | A. Of a letter that I had sent to Doreen that I |
| 6 | had sent to Amy. |
| 7 | Q. Okay. Was there anything else? |
| 8 | A. No. Everything else had been turned over |
| 9 | when I, before I left American. |
| 10 | Q. Do you know what a passenger stand is? |
| 11 | A. Sure do. |
| 12 | Q. Could you tell me what it is? |
| 13 | A. It's a staircase that's attached, used to be |
| 14 | attached to the back of a truck, but now it's |
| 15 | attached to a mobilized platform. |
| 16 | Q. During the period that you worked at American |
| 17 | Airlines, were you aware of whether ticket |
| 18 | agents were required to operate a passenger |
| 19 | stand? |
| 20 | MS. MARIANI: Objection. You may answer. |
| 21 | A. Ticket agents? |
| 22 | Q. (By Mr. Tewhey) Yes. |
| 23 | A. Were they required to? No. Ramp agents |
| 24 | were. |

| | 55 |
|---|---|
| 1 | Q. And were ramp agents part of an airport |
| 2 | agent, the airport agent position? |
| 3 | A. This goes back a long time, but there was |
| 4 | ticket counter and ramp agents. Ramp agents |
| 5 | worked ticket lift. It was ticket |
| 6 | counter/ticket lift. Somewhere along the |
| 7 | line everybody just went to -- they used to |
| 8 | be two separate bids. They were two separate |
| 9 | work groups. They decided to mesh it to one |
| 10 | work group maybe back in the '80s sometime. |
| 11 | Q. In the mid '90s to early 2000, were ticket |
| 12 | agents required to operate passenger stands? |
| 13 | MS. MARIANI: Objection. You may answer. |
| 14 | A. Not unless they bid ticket lift. |
| 15 | Q. (By Mr. Tewhey) And could you tell me what |
| 16 | mobile stairs are? |
| 17 | A. We didn't have them in Boston. We made the |
| 18 | big time. We had jet bridges. |
| 19 | Q. At the time you left American Airlines, was |
| 20 | American Airlines still operating passenger |
| 21 | stands? |
| 22 | A. We didn't have jet stands for a long, long |
| 23 | time. |
| 24 | Q. Do you recall how long? |

| | 56 |
|---|---|
| 1 | A. I'm going to say from 1978 on. |
| 2 | Q. So are you saying that from 1978 on, and I |
| 3 | just want to be clear on this, that at Logan |
| 4 | Airport that there were no passenger stands |
| 5 | in operation? |
| 6 | A. At Logan Airport, there are passenger stands |
| 7 | in operation. At American Airlines, there is |
| 8 | none in operation. For emergency purposes, |
| 9 | we have access to them. But as part of our |
| 10 | daily operation, no, they're not used. |
| 11 | Q. And when you say for emergency situations, |
| 12 | could you describe what you mean by emergency |
| 13 | situations? |
| 14 | A. Yes. Just like the Jet Blue incident that |
| 15 | just happened someplace else. Emergency |
| 16 | landing that you had to go out and evacuate |
| 17 | people you would use passenger stands. |
| 18 | Q. And do you know in those situations was it |
| 19 | airport agents who operated the passenger |
| 20 | stands at Logan? |
| 21 | MS. MARIANI: Objection. |
| 22 | Q. (By Mr. Tewhey) For American Airlines? |
| 23 | MS. MARIANI: Objection. You may answer. |
| 24 | A. It depends. It depends on the nature and the |

```
                                                   57
1        severity of the accident.
2    Q.  (By Mr. Tewhey)  Do you know if there are
3        other individuals who operate passenger
4        stands for American Airlines other than
5        airport agents?
6            MS. MARIANI:  Objection.  You may answer.
7    A.  Can you restate that question, please?
8    Q.  (By Mr. Tewhey)  Let me rephrase it.  Are
9        there other individuals who work for American
10       Airlines at Logan Airport who would be
11       trained to operate passenger stands in an
12       emergency situations other than airport
13       agents?
14           MS. MARIANI:  Objection.  You may answer.
15   A.  Yes.  Maintenance.
16   Q.  (By Mr. Tewhey)  If an airport agent were out
17       for medical reasons and wished to return to
18       work, was there a specific procedure that
19       they were to follow if they believed they
20       needed accommodations to return to work?
21           MS. MARIANI:  Objection.  You may answer.
22   A.  It is my understanding that there is and was,
23       but that was done through Human Resources or
24       Personnel.
```

```
                                                   58
1    Q.  (By Mr. Tewhey)  Do you recall what those
2        procedures were?
3    A.  No.
4    Q.  If an individual airport agent was working in
5        Boston and wished to seek a transfer to
6        another city, could you describe how that
7        process might operate?
8            MS. MARIANI:  Objection.  You may answer.
9    A.  Active employee?
10   Q.  (By Mr. Tewhey)  An active employee.
11   A.  You pull up a transfer request, fill it out,
12       mail it off to Human Resources.  A station
13       file stays on file in Boston and it goes off
14       to Human Resources and they send it out to
15       the station.  If there's an opening, you get
16       the job.
17   Q.  If you're not an active employee, if you're
18       out on a medical leave --
19   A.  You have no ability to put a transfer in to
20       any station.
21   Q.  So an individual who is out on medical leave,
22       if they're going to return to work, has to
23       return to work to the station from which they
24       took the leave; is that correct?
```

```
                                                   59
1            MS. MARIANI:  Objection.  You may answer.
2    A.  Yes.
3    Q.  (By Mr. Tewhey)  If that individual were to
4        return to the station from which they left
5        and became an active employee, could they
6        then seek a transfer to another position?
7            MS. MARIANI:  Objection.
8    Q.  (By Mr. Tewhey)  To another city, excuse me?
9            MS. MARIANI:  Objection.  You may answer.
10   A.  Yes.
11   Q.  (By Mr. Tewhey)  Were there other positions
12       at Logan Airport that an airport agent would
13       be eligible for?
14           MS. MARIANI:  Objection.  You may answer.
15   A.  In classification or out of classification?
16   Q.  (By Mr. Tewhey)  Out of classification.
17           MS. MARIANI:  Objection.  You may answer.
18   A.  You'd have to put a transfer in for them.
19   Q.  (By Mr. Tewhey)  And how did that transfer
20       work?
21   A.  Same as all transfers work.
22   Q.  And were there positions other than the
23       airport agent that an airport agent would be
24       eligible for that were in the classification
```

```
                                                   60
1        of airport agent?
2            MS. MARIANI:  Objection.  You may answer.
3    A.  No.  In the classification of airport agent?
4    Q.  (By Mr. Tewhey)  Yes.
5    A.  That was it.  You were an airport agent.
6    Q.  Ma'am, were you classified during the period
7        of your employment with American Airlines as
8        an airport agent?
9            MS. MARIANI:  Objection.  You may answer.
10   A.  At some point, sure.
11   Q.  (By Mr. Tewhey)  Do you recall when that was
12       and for how long?
13   A.  Oh, my God.  I started there in 1968.  I was
14       qualified as an airport agent for 1968 until
15       I left in 2002, holding various jobs in
16       between.  So, I mean, for my career, I was
17       always qualified to do it because I kept up
18       with the training.
19   Q.  Did you ever work at the ticket counter?
20   A.  Mm-hmmm.
21   Q.  And did you ever work at the ticket lift
22       position?
23   A.  Mm-hmmm.
24   Q.  Were you trained to use the jet bridge?
```

**61**

1  A.  Mm-hmmm.  Yes.
2  Q.  Do you recall --
3      Strike that.
4      While you were in the airport agent position
5      and working at either the ticket lift
6      position or the ticket counter position, at
7      the time you were doing it, did you also have
8      to bid for those positions?
9  A.  Yes.
10 Q.  When you were working at the ticket counter,
11     do you recall any time where you were pulled
12     from that position to operate a jet lift?
13 A.  Yes.
14 Q.  Can you tell me how many times that happened?
15 A.  No.
16 Q.  Was it more than once?
17 A.  Oh, possibly.
18 Q.  Do you know whether it was more than ten
19     times?
20 A.  In the wintertime?  Could have been.
21 Q.  Do you know from the period 1995 to the year
22     2001 how many of the ticket agents were
23     trained to operate the jet bridge?
24 A.  No.  A specific number?

**62**

1  Q.  Yes?
2  A.  No.
3  Q.  Do you know percentage-wise?
4  A.  No.
5  Q.  Could you make an educated guess?
6      MS. MARIANI:  Objection.  You may answer.
7  A.  No.  To be very honest, no.
8  Q.  (By Mr. Tewhey)  Do you know what position,
9      what percentage of the airport agents were
10     eligible to work either on the ticket lift
11     counter or the ticket counter?
12     MS. MARIANI:  Objection.  You may answer.
13 A.  After you pass probation, your first six
14     months, hundred percent.  Your choice.
15 Q.  (By Mr. Tewhey)  By that do you mean that a
16     hundred percent of the agents were trained to
17     operate the jet bridge?
18 A.  No.
19 Q.  So that there was some percentage who were
20     not trained to operate the jet bridge?
21     MS. MARIANI:  Objection.  You may answer.
22 A.  That's not what you asked.  You asked if they
23     could, and everybody had that choice.
24 Q.  (By Mr. Tewhey)  But you couldn't be assigned

**63**

1      to the ticket lift position without having
2      the training to operate the jet bridge; is
3      that correct?
4      MS. MARIANI:  Objection.  You may answer.
5  A.  Nobody was assigned anywhere.  They all had
6      choices in their bidding.
7  Q.  (By Mr. Tewhey)  Yes?
8  A.  If during a shift there was a need to use
9      someone down at ticket lift, that person had
10     to be qualified on the jet bridges.
11 Q.  Okay.  And there were some airport agents who
12     were not qualified for the jet bridge; is
13     that correct?
14     MS. MARIANI:  Objection.  You may answer.
15 A.  They were not trained.
16 Q.  (By Mr. Tewhey)  And if you weren't trained,
17     you couldn't operate it?
18     MS. MARIANI:  Objection.  You may answer.
19 A.  True.
20 Q.  (By Mr. Tewhey)  If an individual wasn't
21     trained to operate the jet bridge, was there
22     a requirement during the period of time --
23     Strike that.
24     If an airport agent wasn't trained on the

**64**

1      operation of the jet bridge, was there a
2      requirement that at some time during their
3      career they become trained in the operation
4      of a jet bridge?
5      MS. MARIANI:  Objection.  You may answer.
6  A.  No.
7      MR. TEWHEY:  Let me take a break for a
8      second.
9      (A break was taken from 11:19 a.m. to 11:32
10     a.m.)
11 Q.  (By Mr. Tewhey)  Just a couple of things.
12 A.  Sure.
13 Q.  If Ms. Cerra had indicated to the medical
14     department that she wanted to return to work,
15     but not to her previous job, that is to some
16     other position, would that kind of a request
17     be referred to Human Resources, if you know?
18     MS. MARIANI:  Objection.  You may answer.
19 A.  First of all, A.A. Medical wouldn't handle
20     that.  They would refer any request by any
21     agent to H.R.  It's up to the agent to make
22     those requests.
23 Q.  (By Mr. Tewhey)  And did anyone from H.R.
24     ever indicate to you that Ms. Cerra was

**65**

1  looking for a position other than her
2  previous job?
3  A. Not to my knowledge.
4     MR. TEWHEY: I have no further questions.
5     MS. MARIANI: I just have a couple of
6  quick follow-up questions.
7     CROSS-EXAMINATION
8  Q. (By Ms. Mariani)  You testified about the
9  position of airport agent today and that of
10 ticket agent and ticket lift agent.  Could
11 you describe for the record the relationship
12 among those three?
13    MR. TEWHEY: Objection.  You can answer.
14 A. An airport agent is a job classification
15 within the company.  When you're an airport
16 agent, you work at the airport.  Same as if
17 you're a rez agent you work at rez.  But
18 ticket lift/ticket counter is semantics of
19 where you're bidding.  An airport agent is an
20 airport agent.  That's it.
21 Q. (By Ms. Mariani)  Was that true for the
22 period of time between 1996 and 2002 when you
23 left the company?
24 A. Yes.

**66**

1  Q. As a customer service --
2     Strike that.
3     What was your last position at the company?
4  A. Customer service manager.
5  Q. As a customer service manager, were you
6  involved in the decision-making process at
7  A.A. Medical with respect to employees within
8  the department?
9  A. Was I involved?  In a way.  I mean.
10 Q. Did you have any responsibility for making a
11 determination as to whether or not an
12 employee was qualified to return to work
13 between 1996 and 2002?
14 A. Absolutely not.
15 Q. Did you have any involvement in developing
16 the job descriptions for airport agents
17 between 1996 and 2002?
18 A. We had a focus group down in Dallas where we
19 all gave our input.  There were certain
20 agents from every station.  We gave our input
21 as to how we would like that job description.
22 So yes, in a certain way.  But as the
23 application applied, no.
24 Q. Would it be a fair statement that between

**67**

1  1996 and 2002 it was not part of your job
2  description as customer service manager to
3  develop the job description of airport agent?
4  A. True.
5  Q. Would it also be a fair statement that you
6  did not set the job qualifications identified
7  in Exhibit 2 for airport agent between 1996
8  and 2002?
9  A. Absolutely.
10 Q. And between 1996 and 2002, did you have any
11 responsibility for determining how seniority
12 accrued for airport agents?
13 A. No.
14    MS. MARIANI: I have nothing further.
15    MR. TEWHEY: I don't have anything.
16    (The deposition of Andrea Valle concluded
17 at 11:36 a.m.)
18
19
20
21
22
23
24

**68**

1      E R R A T A   S H E E T
2
3  In accordance with the rules of procedure
   governing depositions, you are entitled
   to read and correct your deposition.
4  Accordingly, please carefully read your
   deposition and, on this errata sheet, make
5  any changes or corrections in form or
   substance to your deposition that you feel
6  should be made.  PLEASE DO NOT MARK THE
   TRANSCRIPT.  After completing this procedure,
7  sign at the conclusion of such
   changes/corrections (if any) and return it in
8  accordance with your instructions.
9  PAGE      LINE    CHANGE          REASON
10
11
12
13
14
15
16
17
18
19
20
21
22 DATE: _____ SIGNATURE: _____
23
24

|  | |  | |
|---|---|---|---|

69

1       C E R T I F I C A T E

2

3              I, Andrea Valle, do hereby certify

4       that I have read the foregoing transcript of

5       my testimony and further certify that said

6       transcript is a true and accurate record of

7       said testimony.  Dated at _____

8       this _____ day

9       of _____, 2005.

10

11              _____

12                      (Andrea Valle)

13

14

15

16

17

18
19

20

21

22

23

24

70

1       COMMONWEALTH OF MASSACHUSETTS

2       SUFFOLK, ss.

3

4

5              I, Meredith A. Fairbanks, a Shorthand

6       Reporter and Notary Public duly commissioned

7       and qualified within and for the Commonwealth

8       of Massachusetts, do hereby certify:

9              That Andrea Valle, the witness whose

10      deposition is hereinbefore set forth, was

11      duly sworn by me, and that such deposition is

12      a true record of the testimony given by the

13      witness to the best of my skill, knowledge,

14      and ability.

15              IN WITNESS WHEREOF, I have hereunto set my

16      hand and my affixed notarial seal this 18th

17      day of November 2005.

18

19

20              _____
                Meredith A. Fairbanks
21              Notary Public

22

23      My Commission expires:
        November 21, 2008
24

**EXHIBIT 4**

CERRA, DOREEN - #13040                                        02/16/2001
LOC:   WEST PALM BEACH OFFICE

Ms. Cerra returns today.    She is presently on no medications
through this office.    She is on some continued antidepressants
prescribed to her by her psychiatrist.    She is doing quite well
on the antidepressants.    She is on Celexa, Effexor, and lithium
as well as Advil p.r.n..    She states that at present, she is
pain-free, and the pain is rated at 0/10, and she has been back
doing more vigorous activities including a great deal of
gardening.

## PHYSICAL EXAMINATION

PERTINENT FINDINGS:    On physical examination, blood pressure is
130/70, heart rate is 72, respiratory rate is 18.    DTRs are 2+
and symmetrical.    Sensation is intact.    Motor power is 5/5, and
there are no spasms.    Coordination is intact.

## RECOMMENDATIONS/PLAN

1.    At this time, the patient can return to her previous job
      duties since she is pain-free and not having any difficulties
      and is performing higher level activities around the home.
2.    I will recheck the patient on a p.r.n. basis.

JEFFREY S. FARBER, M.D.
Diplomate American Board of
Physical Medicine & Rehabilitation

JSF:medi:90

# EXHIBIT 5



**Jetnet Home**





# NavigAAtor

*...the guide to American Airlines'
policies and procedures*

**Section 6-7**

# MEDICAL SERVICES FUNCTIONS

#### OVERVIEW

The AMR Corporate Medical Department is a team of highly qualified professionals that performs all functions and services in order to meet the diverse needs of corporate medicine and optimize employee health for AMR. The department serves as the focus and ultimate authority on issues pertaining to:

- The health and safety of our traveling public

- The health and wellness of AMR Employees

- The reliability of employees in safely performing their duties through corporate and regulatory drug, alcohol and fitness for duty assessments

#### MEDICAL DEPARTMENT ORGANIZATION

AMR Medical Departments staffed by a physician(s) and registered nurses are located at HDQ-CP4, HDQ-CP5, JFK, LGA, LAX, MIA, ORD, and TUL. The Corporate Medical Department is located at HDQ-CP5.

A Medical Department staffed by a registered nurse is located at AFW.

Additional Medical Offices are located at SERO, SWRO, and SJU. These offices are staffed by Associate and Contract nurses and are primarily available for post-offer medical exams, limited consultations, and return-to-work exams.

Stations without AMR Medical Offices will continue to have a local physician designated as the local medical line consultant. These physicians perform post-offer medical exams when not available from AMR Medical, and provide very limited treatment to employees as necessary. Since the local medical consultant may not be available at all hours, a nearby emergency facility should also be designated by local management and coordinated by AMR Medical. This information is consolidated in the SABRE record, N* (City Code)911. These facilities will be available for needed medical treatment.

are not able to locally accommodate the individual, the applicant must be brought to the attention of Human Resources for a broader accommodation and/or job search. The AMR Corporation upholds the Americans with Disabilities Act of 1992 to the fullest, and exhaustively seeks reasonable accommodation for qualified workers with a disability under the act.

## MEDICAL CLEARANCES

In order to adhere to the high safety standards set by the DOT and the FAA for our air carrier, it is imperative that all safety sensitive employees clear through the AMR Medical Department under certain circumstances after they have been out on an Injury on Duty (IOD) or personal sickness. Additionally, they should clear through Medical if they are prescribed any medications that could affect their alertness or judgment. A list of employee positions deemed by the AMR Corporation to be safety sensitive for these purposes include all job codes subject to DOT/FAA drug or alcohol testing, plus additional job codes whose work directly impacts the safety of the traveling public. A list of these jobs codes may be found in Appendix D.

The Medical Department has a "Call a Nurse" program that may eliminate a personal visit to Medical for this clearance. This program provides the employee a quick telephonic clearance for many employees. The AMR Medical nurse will ask questions pertaining to your condition and may request additional telefaxed medical information. You may be requested to have your physician complete a Physician's Statement Form found in Appendix E.

- Date(s) of treatment

- Treatment received

- Diagnosis of illness or injury

- Medication prescribed

- Prognosis

- Date able to return to work.

If the nurse is unable to make a determination of your clearance, you may be required to provide additional information and/or you may be required to come to one of the AMR Medical facilities. **Medical information provided by external physicians or other health care providers must be based on objective medical testing, and actual physician or health care provider assessments in the provider's office. Documentation provided by providers who are friends or relatives of the employee in home/non-office settings are generally not acceptable.**

Call-a-Nurse is available 0800-2300 CST, seven days a week. The toll free telephone number is 1-800-555-2373 ext. 2.

## TYPES OF CLEARANCES

### *Injury on Duty Clearances*

Only Flight crew members (pilots and flight attendants) are required to have an AMR Medical return-to-work clearance before returning to work from an Injury on Duty (IOD). All other employees will report to work when cleared by their personal physicians, with the following exceptions:

- Those with multiple injuries. For purposes of this exception, we define

multiple injuries as five injuries in five years, or three injuries to the same body part within five years. Employees who fall within this definition will require an AMR Medical assessment.

- Those off duty for more than 1 year.

- Person returning to work after experiencing head, eye or ear injuries.

- Other workers who fall under the Department of Transportation (DOT) drug and alcohol testing programs (such as mechanics, inspectors, and fuelers) who are on medications.

These clearances can be accomplished through a Call-a-Nurse screening, but may be required to have an on-site evaluation, and/or a fitness for duty assessment.

### Personal Clearances

All crew members must clear AMR Medical under the following conditions:

### For Pilots

- Been admitted to a hospital

- A medical history that requires a personal medical clearances as previously determined by the Base Physician or the AMR Medical Director.

### For Flight Attendants

- Hospitalizations

- Treatment for drug and/or alcohol problem

- Blocked ears

- Maternity leave

- A medical history that requires a personal medical clearance as previously determined by AMR Medical

- Absence related to a seizure, diabetes, coronary artery disease or illness that changes vision or hearing

- On proffered leaves of absences in excess of five (5) consecutive years

Other workers who fall under the Department of Transportation (DOT) drug and alcohol testing programs (such as mechanics, inspectors, and fuelers) who are on medications are also required to clear through AMR Medical.

### Non-Safety Positions

For all other management, non-management and clerical positions, the employee may return to work at the discretion of their supervisor. The supervisor may require you to be evaluated by AMR Medical upon return to work, or whenever a reasonable question pertaining to your fitness to perform your essential job functions with or without reasonable accommodation arises. You must contact your supervisor when your

physician clears you to return to work, either with or without restrictions. Restrictions need to be in writing from your physician.

### Confidentiality of Medical Records

In no case should physician reports be transmitted through supervisory channels, since it is anticipated that they may contain confidential medical information. AMR Medical is the ultimate repository for any and all medical information pertaining to an employee. Supervisors or administrative personnel such as Injury Counselors or Lost Time administrators may only have copies of pertinent work restrictions. Other material written by a doctor or health care professional will be immediately submitted to AMR Medical for inclusion in the employee medical file. Medical information is released for review only with the expressed consent of the employee, when we receive a bona fide subpoena, as required by state or federal law, or if the public safety is jeopardized by a lack of release of the information who have a bona fide business necessity for the information.

## MEDICAL CLEARANCE ADMINISTRATIVE ISSUES

The following guidelines will apply consistent with return to work clearance procedures when an employee is required to clear through the Medical Department from an injury on duty in the previous section "Injury on Duty Clearances", and will apply only if the employee is returned to active payroll status:

When the Company first receives medical documentation regarding an employee's return to work, and until the Medical Department finalizes an employee's case, the employee will be coded MCP (Medical Clearance Paid).

If an employee is non-compliant with the return to work clearance procedure, as determined by the Medical Department, the employee will be coded MCU (Medical Clearance Unpaid).

For clearances involving musculo-skeletal conditions, if the Medical Department's findings differ from that of the employee's doctor and find work restrictions, under certain circumstances the employee may be offered a Company sponsored work-strengthening program.

During this process the employee may be assigned work he can perform safely and return to work. If no such work is available, the employee must use sick or other available or qualified leave until completion of the work-strengthening program and a re-evaluation by the Medical Department.

This becomes effective 7/31/2001 and is not retroactive.

## PHYSICIAN DISAGREEMENTS

If there is a disagreement between an employee's physician and the AMR Medical Department, an employee may, within fifteen (15) days of the date of written notification of this disagreement; at his option, may have a review of his case in the following manner:

● The employee may employ a qualified medical examiner of his or her own choosing and at his or her own expense for a physical examination to render a work disposition opinion. A copy of this examination will be provided confidentially to the AMR Medical Department. Medical records will always be maintained in confidential medical folders, and are never released to supervisors or any third party without the employees expressed

written consent.

● Should the medical examiner chosen by the employee disagree with the findings of the AMR Medical Department, AMR Medical, at the written request of the employee, ask that the two medical examiners agree upon and appoint a third qualified and disinterested medical examiner, for the purpose of conducting an independent physical examination of the employee.

● Such three (3) doctors, one representing the company, one representing the employee, and the disinterested doctor approved by the AMR Medical doctor and the employee's doctor, shall constitute a board of three, the majority vote of which shall decide the work disposition regarding the employee's case. The work disposition shall be binding.

● The expense of the employment of the third medical examiner shall be borne one-half by the employee and one-half by the company. Copies of the Board's report shall be furnished to the company and the employee.

● If the majority opinion of the Board of three (3) medical examiners upholds the employee's case, he shall be restored to his former job and be paid for time lost, at straight-time rates, less any amount he may have received as compensation during the interim period.

Should the medical examiner chosen by the employee agree with the findings of the AMR doctor, but disagree regarding the employee's ability to return to his job, the following shall apply:

● The employee may appeal to a Professional Review Panel to be composed of the Vice President-Employee Relations, AMR's Corporate Medical Director and a physician appointed by the employee. This board shall be empowered to return the employee to his former job. The decision of the Board will be final and binding, the majority vote deciding the case.

● The expense of the employment of the third physician (if necessary) shall be shared equally by the parties.

If a dispute should arise from the above applications, the company will supply to the employee's personal physician, upon receipt of a signed release from the employee, a copy of the employee's medical records that pertain to the dispute.

Provision and disclosure of such medical records shall be in conformity with applicable government regulations.

For employees represented under collective bargaining agreements, those agreements supersede this regulation. This regulation applies only to those AMR employees that are not represented by collective bargaining agreements, and who are not deemed as 'safety sensitive' employees as listed in Section 6-3, Appendix A, Alcohol and Drug Policy.

**SUPERVISOR
RESPONSIBILITY -
CLEARANCE**

If an employee has been off work, it is your responsibility to ensure that the employee has cleared through Medical as defined above. There may be times when the employee has been cleared and you are uncertain if the employee is capable of performing their job. If this happens, contact the Medical base closest to you and discuss possible arrangements for a fitness for duty assessment.

## RESTRICTED DUTY POLICY

It is the policy of American Airlines to assist employees injured on or off the job, or sick employees, with a restricted or transitional duty assignment when such assignment is only required for a limited period of time and can be operationally accommodated. Transitional Duty (TD) applies only to employees recovering from an Injury on Duty. Information regarding Transitional Duty assignments can be found in Section 6-11, Employee Injury-on-Duty. Restricted Duty (RD) applies only to employees recovering from a non-work related injury or illness. Information regarding Restricted Duty is contained in Section 1-5, Attendance.

## PHYSICIAN ON CALL (POC)

AMR Medical provides 24 hours a day, seven days a week "on call" physicians for in-flight emergencies and assistance with passenger boarding questions. This program provides for real-time assessments of in-flight medical problems including treatment and diversion recommendations. This program is available to all flight, Special Assistant Coordinators (SAC), dispatch, CCRO and ground operations. Each physician is on call for one week and is available by pager and cellular phone. The physician on call may also be reached at any time by a supervisor who needs immediate assistance with employee issues.

**Responsibility of Individual Requiring Use of Physician on Call (POC)**

If there is a question regarding the stability of a customer's condition, call the CCRO and they will coordinate with the Physician on Call (POC). The physician will further coordinate with the customer's physician whenever necessary to discuss the passenger's condition and potential hazards of flying.

For all ground personnel to reach the CCRO, call from any company phone ICS 967-7299. The CCRO can determine if the POC needs to be notified. The POC schedule is kept at the CCRO in a DECS.

## MEDICAL REVIEW BOARD

The Medical Review Board is comprised of AMR Medical doctors who evaluate cases on an individual basis to determine permanent restrictions, clearance to return to work, and fitness-for-duty and other medically related issues. The board meets via teleconference every week.

## SUMMARY

Nothing in this regulation will eliminate the responsibility or authority of local management to assure that an employee is qualified and capable of performing his or her assigned work. Should a question arise about the ability of a given employee to perform the essential functions of his or her job, the employee's supervisor may request medical consultation and examinations as necessary.

## SUPERVISOR RESPONSIBILITY / ACCOMMO-DATIONS

You will be responsible for determining if a reasonable accommodation can be provided in the employee's present job position. If not able to do this, they will contact the HR representative and assist in applying for an accommodation based on the assigned permanent restrictions, via the Accommodation Review Board (ARB).

# EXHIBIT 6



Employee Directory | Help | Site Map | Contact Us | Logout

Click Here for Advanced Search

**Jetnet Home**





# NavigAAtor

*...the guide to American Airlines'
policies and procedures*

**Section 5-11**

## INJURY ON DUTY LEAVE OF ABSENCE

### OVERVIEW

If you are a regular employee, there is an unpaid injury on duty leave of absence (IDLOA) that may be available to you. To be eligible for this leave, you must be unable to work following an absence due to a compensable extended illness or injury sustained while on duty. This leave is intended to allow you additional time to recover so that you may return to work.

This applies to all regular employees except where it conflicts with a labor agreement. The company, as permitted by law, reserves the right to require you to take FMLOA in conjunction with IDLOA.

**EMPLOYEE
RESPONSIBILITY**

An IDLOA must be authorized by AA Medical. It is your responsibility to ensure that AA Medical has timely information from your medical provider that includes the reason for the leave, the start date of the leave, and the expected duration of the leave. In no case will your IDLOA exceed five years.

If an IDLOA is authorized for you, it is your responsibility to maintain contact with the company regarding the status of your leave and your anticipated return from leave.

The benefits and privileges associated with IDLOA are outlined in the Employee Informational Letter for IDLOA found in Appendix A.

**SUCCESSIVE
INJURY ON DUTY
LEAVES**

If you return to work from an Unpaid Injury on Duty Leave of Absence and later return to a Injury on Duty leave for the same illness or injury, your later Injury on Duty leave will be considered part of the prior leave. This provision will not apply to you if you have returned to active payroll on a full duty basis for at least three months, or if the later Injury on Duty leave is due to any injury or illness unrelated to the previous Injury on